### EX PARTE JOHN ALDRIDGE

No. 31,189. November 18, 1959

Relator's Motion for Rehearing Overruled January 13, 1960

Relator's Second Motion for Rehearing Overruled February 17, 1960

Order Staying Issuance of Mandate Set Aside
and Mandate issued and Filed April 21, 1960

*John R. Lee,* Kermit, for relator.

*George Gray,* County Attorney, Odessa, and *Leon Douglas,* State's Attorney, Austin, for the state.

DAVIDSON, Judge.

After notice and hearing, relator was adjudged to be in contempt of the 70th Judicial District Court of Ector County, which court will be referred to hereinafter as the district court.

No appeal lies from such decree. Relator applied to this court for the writ of habeas corpus, in order to test the validity of that judgment and of his arrest and incarceration thereunder.

Inasmuch as the contempt proceeding grew out of a criminal case, we granted the writ and made it returnable to this court.

On June 22, 1959, the case of the State of Texas v. T. M. Shirley, wherein the defendant was charged with the capital felony offense of murder, went to trial in the district court before the Honorable Paul McCollum, Judge Presiding. The Honorable Warren Burnett, a former partner of Judge McCollum, was counsel for the defendant.

As is the custom in this state in capital felonies, each of the prospective jurors, here, was examined severally and apart from and out of the presence of the other prospective jurors. Those prospective jurors who were waiting to be examined and from whom the jury was to be selected were directed to remain out of the court room in the courthouse corridor immediately adjacent to the court room, proper.

The trial of the case had progressed to the point that on the morning of June 25th four jurors had been selected and empaneled, after which the court continued its work of completing the jury from the list of prospective jurors.

Shortly prior to the noon recess on that day, what is hereafter referred to as state's exhibit No. 1, the publication containing the alleged contemptuous matter, was brought to the attention of Judge McCollum and the attorneys representing the state and the defendant as having been circulated and distributed in and around the courthouse and upon the public streets of Odessa, the city where the trial was being held.

A discussion ensued between the parties named, touching the probable effect of the publication upon the murder case then upon trial. In the course of that discussion it was discovered that approximately twenty copies of the publication had been placed upon a chair in the corridor near the entrance to the court room where the prospective jurors were kept and assembled. Those copies were therefore available for inspection.

After consultation, Judge McCollum and counsel for the state were convinced that, under the circumstances, the circulation of the publication in and around the courthouse and among the prospective jurors had interfered with the trial of the case to the point that a fair trial could not be had in the murder case nor a jury selected from among the prospective jurors.

Accordingly, in view of that finding and the suggestion of counsel for the state, the four jurors who had been selected were dismissed and the trial of the murder case was postponed.

According to his testimony, Judge McCollum entered his order because he was convinced that the circulation of the publication constituted "an imminent serious threat to the ability of (the) Court in securing jurors to give fair consideration to the case" and because he considered the publication at the time and when "viewed in the light and under the circumstances then existing to be a clear, present, and apparent danger to the administration of justice."

This conclusion appears to have been based primarily upon the fact, as stated by Mr. Burnett in his testimony, that the publication "conveyed and calculated and intended to convey, and falsely represented, charging the Court with partiality and charged that the Presiding Judge and District Attorney were corrupt, and influenced in favor of (Burnett) in the Shirley murder case (sic)."

After the jury in the murder case had been dismissed and the trial discontinued and after an investigation prompted by Judge McCollum as to the propriety of a contempt proceeding, counsel for the State of Texas instituted this proceeding by filing a complaint in the district court seeking to have the relator adjudged in contempt of court as the publisher and circulator of the publication above referred to as state's exhibit No. 1, which reads as follows:

"'C. C. C. News
"June 27, 1959

"Vol. No. 5 No. 20                                        Odessa, Texas.

"For weeks, the C. C. C. News has tried to bring you the facts, about your County Officials, now holding office, and the facts have been brought to you the people. They have been presented to you honestly and fearlessly, for many weeks, this publication has tried to tell the people that (RINGMASTER) Davis is in complete control of your Commissioners Court, the last week, this was proven beyond any shadow of doubt. Because while the (RINGMASTER) was wallering around in the Ocean Water of California on the taxpayers money, he apparently issued orders for two Commissioners to leave town, and this they did. (Sic)

"And two Commissioners did leave town, and this is verified by the Odessa American in Sunday and Monday's issues of this week, and I quote in part, 'Norman Maney and Ted Roby were out of town,' in other words a quorum of the Commissioners Court were not present. And why was this done, because the (RINGMASTER) had already intimated, that he and the other two members of the BIG THREE were going to appoint the next County Attorney. And the one that they want is the Law Pardner of Warren Burnett. Mr. Burnett boasts that he already has the District Attorney's office and the District Judge under his heel and now he wants the County Attorney's office under his heel. (Sic)

"And certainly this must be true, watch the murder trial which is going on in the District Court this week, and who is the Defense Lawyer Mr. Warren Burnett, at a purported price of TWENTY FIVE THOUSAND DOLLARS to defend this man, which is legal and fine, but, Mr. Burnett should have to go into Court without any apparent FIX, in other words, this publication is not criticizing his FEE but, certainly we would criticize the method in which he boasts, to get these cases, in other words his boasting that he and Judge McCollum used to be LAW PARDNERS.' " (sic.)

The complaint alleged and charged that the foregoing publication was contemptuous in that:

" * * * said article conveyed and was calculated and intended to convey and falsely represent and charge the Court with partiality and that the Presiding Judge and the District Attorney were corrupt and influenced in favor of one of the attorneys for the Defendant in the aforesaid cause; that upon ascertaining that said copies had been distributed, placed and circulated in and around said hallway and corridor of the Courthouse and in the City of Odessa, Texas, the State, by and through its attorneys, moved and requested the Court to grant a mistrial of said capital cause; that the Court, after having considered the said motion and argument of counsel, granted said motion, excused the four jurors selected, and reset the cause for a later date; that aforesaid untrue and defamatory article so published and circulated did interrupt, interfere with and obstruct the proceedings of a Court of Justice; that said article directly reflects on the Court's honor and dignity; that said article tends to belittle, degrade, impede and embarrass the administration of justice and the functioning of the Court; that the Court's honor and integrity have been impugned and attacked—both as to the

Judge Presiding and to its officers; that said article was reason-ably calculated to interfere and did interfere with the due administration of justice in a case pending before the Court, and that said article in the setting and light of articles appearing in both prior and subsequent publications of the aforesaid publication or newspaper, reproduced copies of which are at-tached hereto and made a part hereof, presents a clear and present danger to the administration of fair and impartial justice and creates an imminent and serious threat to the ability of the Court to give fair consideration to the cause then before the Court; that the publication and the circulation thereof of the aforesaid article did prejudice the rights of both parties in the aforesaid cause; that the said publication and circulation by the aforesaid John Aldridge is in and constitutes gross contempt of all the rules of Court designed for the pure and impartial administration of justice in Ector County, Texas, the county wherein the publication or newspaper was published and circulated."

The contempt proceeding came on for trial before the Honor-able J. H. Starley, Judge of the 143rd Judicial District, sitting for and as judge presiding in the 70th Judicial District.

At the trial, relator did not testify nor did he offer any affirmative defensive testimony. His defense was that he excepted to the proceeding upon constitutional grounds.

It is relator's contention that the publication was authorized under the constitutional provisions of freedom of the press and that the judgment of contempt denied to him due process of law under the Fourteenth Amendment to the Federal Constitution.

Relator relies for relief and discharge from the contempt judgment upon the so-called "clear and present danger" doctrine —which is that freedom of the press shall not be impaired through the exercise by state courts of contempt proceedings unless there is a clear and present danger that the utterances in question present a serious and imminent threat to the due administration of justice.

As supporting his contention, relator cites the cases of Bridges v. Florida, 314 U. S. 252, 86 L. Ed. 192, 62 S. Ct. 190; Pennekamp v. Florida, 328 U. S. 331, 90 L. Ed. 1295 66 S. Ct. 1029; and Craig v. Harney, 331 U. S. 367, 91 L. Ed. 1546, 67 S. Ct. 1249. All of those cases are by the Supreme Court of the United States.

We are familiar with those cases and the holdings announced therein. Indeed, Craig v. Harney reviewed and overturned the decision of this court. See Ex parte Craig, et al, 150 Tex. Cr. R. 598, 193 S. W. 2d 178, 204 S. W. 2d 842.

We are also aware that the Supreme Court of the United States, in reviewing the ruling of a state court to determine whether the clear-and-present-danger doctrine applies, will reach a conclusion from its independent examination of the facts in each particular case.

The decisions of the Supreme Court of the United States are authoritative and binding upon this court in cases having the same or similar fact situations. It is apparent, therefore, that this court must make its own examination of the facts shown by the record made in the trial court and, from those facts, reach a conclusion. If our appraisal of those facts reasonably and fairly makes applicable and controlling the clear-and-present-danger doctrine as announced by the prior decisions of the Supreme Court of the United States, it is our duty to follow and we would have no hesitancy in following those decisions as established precedents.

It is in the light of these conditions that we are to arrive at a conclusion in this case.

At the outset, let it be understood that we are not committed to the proposition that this is a case of constructive contempt— that is, one occurring outside the presence of the court—as distinguished from direct contempt, which occurs in the presence of the court.

The wording "in the presence of the court" does not necessarily mean "in the immediate presence" of the judge of the court. The court is present whenever any of its constituent parts are engaged in the prosecution of the business of the court, which constituent parts include the judge, the court room, the jury, and the jury room. 12 Am. Jur., Sec. 5 p. 392.

While it does not appear that the alleged contemptuous publication was actually distributed and circulated in the court room, proper, during the trial of the murder case, the undisputed evidence shows that the publication was circulated among and placed in the immediate presence of those prospective jurors who were waiting outside the court room in the corridors of

the courthouse, where they had been assigned to wait before being called to be examined and selected upon the jury then in the process of being selected.

The presence of the court extended to and included the prospective jurors and the place assigned to them to wait.

That the circulation of the publication did, in fact, interfere with the due administration of justice was judicially determined by the court, because the trial of the murder case could not proceed nor could the jury be completed by reason of the situation brought about by the circulation of the publication to and among the prospective jurors.

A dismissal of the jurors who had been selected and a postponement of the trial resulted.

It is apparent, therefore, that we are not here confronted with any question as to what might have been the effect of the publication, or whether it was calculated to bring about or constitute interference with the due administration of justice by the courts of this state. There is no room for speculation as to that proposition, for, here, according to the judgment of the trial court, the due administration of justice was interfered with as the direct result of the circulation of the publication.

The question, then, is whether the trial judge was justified in reaching the conclusion that he did—which was that the publication had interfered with the due administration of justice in a case which was then upon trial.

If the trial judge was justified in reaching that conclusion, then direct contempt was shown to have been committed in the presence of the court by the circulation of the publication.

The clear-and-present-danger doctrine, therefore, has no place here, save and except as it may serve as a guide to a determination of the question before us, which is whether the trial court was warranted in holding that the circulation of the publication did in fact seriously interfere with the case upon trial and bring about a halt in the trial and the dismissal of the jurors who had already been selected in the case.

The judge who rendered the contempt judgment filed conclusions of fact in this case, in which he set forth the fact

situation upon which the judgment of contempt was entered. The following is quoted from those findings:

"That Respondent John Aldridge knew and had reason to know that such printed matter would be circulated in the Courthouse of Ector County, Texas, during the trial of said cause therein referred to then in process of being heard in District Court of said Ector County, Texas.

"That because of the circulation of Exhibit Number One, a mistrial was and had to be declared by the then presiding judge of the case therein referred to and then in process of being tried because of, and solely because of, circulation in Ector County, Texas, of said Exhibit Number One.

"That said Exhibit Number One was scurrilous, untruthful and the material allegations did reflect upon the propriety, honor and integrity of the District Court of Ector County, Texas, the District Judge thereof, and two of the officers of said Court, to-wit, the District Attorney and chief Defense Counsel.

"That said Exhibit Number One does belittle, degrade and impede and embarrass the administration of justice and the functions of said District Court of Ector County, Texas, in the county seat, community and County wherein said same was circulated. That same was in fact not only an imminent and serious threat to the ability of the District Court of Ector County, Texas, to obtain a jury and fairly and impartially try the Defendant, T. M. Shirley, in said cause referred to therein, but did cause the District Court of Ector County, Texas, to interrupt the normal, fair and impartial functions of the judicial processes of the District Court of Ector County, Texas, and of the people of Ector County, Texas.

"That said Exhibit Number One viewed in the light and under the circumstances then existing was a clear, present, apparent, and obvious danger to the administration of justice.

"That said Exhibit Number One did obstruct the proceedings of a District Court of justice.

"That John Aldridge, whether individually, or as editor, publisher, or president of John Aldridge Publishing Company, Inc., was the person that caused said Exhibit Number One to be emitted and circulated in and around Odessa, the county seat

of Ector County, Texas, wherein it referred to a case then in the process of being tried in the duly and legally constituted District Court of Ector County, Texas, in and for the 70th Judicial District of Texas.

"That the acts complained of in the verified affidavit and complaint occurred within the jurisdiction of this Court and are each and all true."

Relator reserved no exception to nor did he challenge the correctness of those conclusions of fact, especially the finding that the publication reflected "upon the propriety, honor and integrity of the District Court of Ector County, Texas, the District Judge thereof, and two of the officers of said Court, to-wit, the District Attorney and chief Defense Counsel."

To overturn the trial court's finding of facts we would have to find that those facts are without any support in the evidence and that the trial court was therefore unauthorized to draw such conclusion from the evidence in the case.

It must be remembered that relator made no effort to defend the publication or the truthfulness of the statements made therein, nor did he make any explanation thereof.

Appellant challenges before this court the sufficiency of the findings as also the sufficiency of the facts to show that he was the publisher of the publication or the distributor and circulator thereof.

As to this, the evidence reflects that the publication was published by the John Aldridge Publishing Company, a corporation which bore the name of the relator, and that relator was the president of the corporation.

The witness I. C. Jarman testified that he distributed some of the issues of June 27th (the issue in controversy) and that some of the issues he bought from relator at his (relator's) house or office.

The witness C. H. Glover testified that he was the owner of stock in the John Aldridge Publishing Company, which stock he purchased from relator, and that his place of business adjoined that of the publishing company. He directly connected relator with the publication of the newspaper, by the following testimony:

"(Q How many employees are there in the John Aldridge Publishing Company?) A. *I don't know that he has any.*

"(Q Does Mr. Aldridge do all the work himself?) A. Some of us help him, but so far as having anybody employed, *I don't think he hires anyone* other than those kids to deliver the papers."

"(Q Do you know whether or not Mr. Aldridge is the one who publishes the C. C. C. News?) A. Well, I suppose he is, you get them out of his office there, and he has got a little press."

Two district judges in this state—that is, the judge presiding over the trial of the murder case and the judge presiding over the contempt proceeding—have judicially determined that the publication did in fact bring about an interference with the due administration of justice in a court of this state.

We do not agree that the facts did not warrant or authorize such findings. We are unable to agree with relator that the trial court was not authorized to find as he did.

The right to a free press is a valuable right of the people, a right to be protected and maintained. But so is the right to have a fair trial in the courts of this state, free from outside influence or interference.

The courts enforce our constitutional guarantees, and that power must be maintained in order that the courts, themselves, may not be destroyed.

The conclusion is reached that the trial judge was authorized to reach the conclusion and enter the judgment that he did in holding relator in contempt of court.

The relief prayed for by the writ of habeas corpus is denied and relator is remanded to the custody of the arresting officer.

## ON MOTION FOR REHEARING

MORRISON, Presiding Judge.

Relator strenuously urges that the effect of our original opinion was to hold him guilty of "direct contempt" and that we erred in so holding because it was not shown that relator

personally placed the copies of the newspaper in the corridor adjacent to the courtroom.

While it is true that we did state in our original opinion herein that we were not committed to the proposition that this was a case of constructive contempt, this entire proceeding appears to have been initiated and tried on the theory that relator was guilty of constructive contempt, and we have again concluded from a re-examination of the record that the state proved beyond a reasonable doubt that relator published the contemptuous matter which constitutes the basis for this proceeding. In addition to what we pointed out originally, the state offered the evidence of employees of the West Texas Office Supply Company, who testified that they made offset plates for the C.C.C. News and that relator brought the order into their place of business and paid for the work when it had been done. They identified copies of the C.C.C. News introduced in evidence as being work which relator had brought to their shop and from which they made the plates, all of which bear the same format. Further, the state called Ricky Glover, who testified that relator hired him to deliver copies of the C.C.C. News and that he had on several occasions seen relator doing the printing thereof himself. The witness Boone, an attorney, testified that he had secured the corporate charter for relator and that relator had on occasions shown him material which later appeared in the C.C.C. News. C. H. Glover testified further that he was relator's landlord and on occasions helped relator run off and distribute copies of the C.C.C. News. Another witness was called, who testified that he had bought a share of stock in the John Aldridge Publishing Company from relator.

We find no merit in relator's contention that contempt is not here shown because the copies of the C.C.C. News were found in the corridor during the noon recess.

Remaining convinced that we properly disposed of this cause originally, relator's motion for rehearing is overruled.