Odom, J., filed opinion concurring in the result, in which Onion, P. J., joined.

Morrison and Douglas, JJ., filed separate dissenting opinions.

**Ex parte J. D. ARNOLD.**

**Ex parte Brent STEIN.**

**Nos. 47227, 47228.**

Court of Criminal Appeals of Texas.

Jan. 9, 1974.

Ed J. Polk, Youth Law Center, San Francisco, Cal., Douglas R. Larson, Jim Maddox, Dallas, for appellant.

Henry Wade, Dist. Atty. and William J. Teitelbaum, Asst. Dist. Atty. Dallas, Jim D. Vollers, State's Atty. and Buddy Stevens, Asst. State's Atty., Austin, for the State.

## OPINION

ROBERTS, Judge.

Relators seek relief from a judgment in Criminal District Court No. 5 of Dallas County, holding them in contempt of court and assessing their punishment at six months' confinement in the county jail.

On April 6, 1972, relators, accompanied by a third individual whose name was not revealed but who was referred to as "John Doe," attempted to take pictures of Officer Robert Harden, an undercover agent for the Texas Department of Public Safety. Officer Harden, on the date of the occurrence of the act for which relators were held in contempt, had been testifying as the State's chief witness in a trial being conducted in Criminal District Court No. 5. The events constituting the alleged contemptuous conduct occurred as Officers Harden, Floyd and Maxwell were returning to the courtroom following the noon recess. As the three officers stepped from the elevator into the hall outside the courtroom, the unnamed man, "John Doe," pointed to Officer Harden and said, "That's the man." At this point, relator Stein, known also as Stoney Burns, began taking pictures of Officer Harden. When requested not to take pictures, he persisted. As Officer Harden attempted to put his arm in front of his face, Arnold and "John Doe" allegedly grabbed Officer Harden's arms and held them to his side so that Stein could continue to take photographs. The court was immediately informed of the events which had taken place and Arnold, who was seen standing outside the courtroom, was brought before Judge Ed Gossett and, without a hearing being conducted, was held in contempt. Arnold's motion for new trial was granted and both Arnold and Stein were ordered to appear

before the court and show cause as to why they should not be held in contempt. Following this hearing, both relators were found to be in contempt of court.

In one ground, it is charged that the evidence is insufficient to support the findings of the court. First, however, some background on this infrequently discussed topic is necessary.

## I.

### Contempt Proceedings in Texas

"In this state, we have no statute defining contempts of court, and we are relegated to the doctrine of contempts at common law." Ex Parte Green, 46 Tex.Cr.R. 576, 81 S.W. 723 (1904). Also, this State has traditionally recognized that there are two *classes* of contempt.

## A.

### Direct Contempt

This is generally defined as "[c]ontempts in the presence of the court (that is, in facie curiae)." Ex Parte Lake, 37 Tex.Cr.R. 656, 40 S.W. 727 (1897). The distinction between this type of contempt and constructive contempt was well stated by the Supreme Court of Texas in Ex Parte Ratliff, 117 Tex. 325, 3 S.W.2d 406 (1928):

"In the one [direct contempt] the court sees and knows of all the acts which constitute the contempt, and needs no testimony to establish their existence as facts, while in the other [constructive contempt], testimony must be heard to inform the court, and, this being so, due process of law demands that this testi-

mony should be heard publicly, in open court, and by both sides to the controversy, after due notice to the accused of what is alleged against him, in order that he may have an opportunity to meet and explain it." [1]

Apparently, the farthest that this Court has, to date, carried the concept of direct contempt occurred in the case of Ex Parte Aldridge, 169 Tex.Cr.R. 395, 334 S.W.2d 161 (1959). There, the relator was found to be in direct contempt of the court where he circulated a publication [2] in the immediate presence -of prospective jurors who were waiting outside the courtroom in the corridors of the courthouse. This Court held that "the presence of the court" extended to and included the prospective jurors and the place assigned to them to wait. The Court found that the contemnor clearly interfered with the due administration of justice there, since a dismissal of the jurors and a postponement of the trial resulted.

█ Applying the above rules of law to the present fact situation, we conclude that the petitioners could not be found to be in direct contempt.[3] Both sides agree that the incident did not occur in the courtroom. And even using the rationale advanced in Aldridge v. State, supra, the record does not reflect that justice was interfered with in this cause. The State argues that the undercover agent's "demeanor" as a witness was affected by this incident. The record reflects that this agent stated at the hearing on the contempt charges:

"I was thinking that they would publish my picture in the paper. I was thinking of the danger to my life, the security of my job, how it would affect my job in

---

1. It should be pointed out that the judge in the present case held the petitioners "guilty of *both* constructive and actual contempt." [Emphasis added]

2. The publication related to the trial judge's alleged bias in the case.

3. The State, in its brief, recognizes that after the court had Arnold brought into the courtroom, it summarily found him guilty of contempt. According to the State, the judge later granted a motion for new trial because he realized *"that this was not a direct contempt."* [Emphasis added]

this area especially, and possible all over the State of Texas, and that was about it." [4]

This same witness testified that his forearms were held for "just a couple of seconds" while his picture was taken. This Court is unwilling to take this testimony and conclude that the entire administration of justice in this trial was disturbed by the incident. There was absolutely no evidence presented that the accused on trial in the courtroom (Boykin) was in any way prejudiced or harmed by the incident, nor can we see how the State's case was compromised. The agent whose picture was taken testified that he certainly did not withhold any information from the Boykin trial as a result of this incident.

Apparently, the most offensive part of the incident to the agent was the picture-taking itself, and not the "physical restraint" imposed on him during the episode.[5]

### The Propriety of the Picture-Taking

■ The State condemns this picture-taking because of the danger it would pose to the undercover agent if the photographs were published. As Agent Harden stated, "I figured that they were taking the pictures in order to publish them for the dope dealers to see in the area." Thus, the unveiling of this agent's secret identity seems to play a most important role in sending the petitioners to jail for six months.

It occurs to this Court that the agent should not be able to complain of this when he lifted that veil himself the minute he walked into the courtroom and took the stand as a witness in a public trial. Certainly, any citizen would have had the right to sit in that courtroom and witness the proceedings in the Boykin cause, as well as observing the witnesses who testified.[6]

The record reflects that the same reasoning we now advance was stated by the trial judge himself at one point. One of the defense counsel inquired of Agent Harden:

"Q Have you been assured by this Court that you may expect the protection of the Court, of the confidentiality and confidential nature of your work, of the secretness of your work?

"A THE COURT: *Counsel, this Court couldn't give him any such assurances if he wanted to."*
[Emphasis added]

As for the taking of the pictures, the court stated at one point, "It's a general rule of this Court and everybody understands it. The bailiffs are instructed that no pictures are to be made in this Court." That did not occur in this case.

■ We have no doubt that any person on the streets outside the courtroom, whether he were a member of the press or not, could have legally walked up to this agent, or any other person and taken his picture.[7] Certainly, there can be no reasonable expectation of privacy when a person places himself in a public place.[8]

4. This line of questioning was pursued by the prosecutor only after the trial judge himself prompted, "Counsel, you might ask the witness why he didn't want his picture taken."

5. During the contempt hearing, defense counsel inquired whether he was there "to defend physical restraint or taking of pictures?" To this inquiry, the State responded, "Your Honor, at this time the State would ask that the Court not try to justify his rulings to these clowns [referring to the two defense counsel]. This is a proceeding."

6. Certainly, we recognize that unusual situations may develop where a judge is forced to limit the number of spectators or reporters, perhaps for reasons of security in the courtroom or lack of space.

7. A supplemental transcript filed with this Court contains excerpts from the Boykin trial. When the court was informed of what had occurred in the hallway, it stated, "Go bring him in here and we will get their cameras."

8. We refer the reader to the case of Buchanan v. State, 471 S.W.2d 401 (Tex.Cr.App.1971).

## B.

### Constructive Contempt

■■ Is it possible to uphold the trial court on this basis? We refer the reader to the case of Ex Parte Lake, supra. This 1897 case has never been overruled and it states:

> "To be guilty of a constructive contempt, there must have existed at the time some order or some writ which he [the accused] violated."

The State infers that the "order" that was violated in this case was the rule of evidence. The Vernon's Ann.Code of Criminal Procedure, in Article 36.03, states:

> "At the request of either party, the witnesses on both sides may be sworn and placed in the custody of an officer and removed out of the courtroom to some place where they cannot hear the testimony as delivered by any other witness in the cause. This is termed placing witnesses under rule."

We fail to perceive how this rule was violated by the alleged contemptuous activity.

In this cause, there was *no* order of the court which the contemnors violated.[9] Therefore, the court had no power to summarily punish for contempt which allegedly occurred not in the presence of the court. Ex Parte Hardin, 161 Tex. 567, 344 S.W. 2d 152 (1961). Unfortunately, this is exactly what happened initially in this case. When the court was informed as to what had happened in the hallway outside the courtroom, relator Arnold was immediately held in contempt, without notice or an opportunity to be heard. At this first proceeding, Arnold was given a punishment of three days in jail or a fine of $100.00.

However, after requesting and receiving a trial on the contempt charge, both relators received the maximum punishment available; i.e., six months in jail and a fine of $500.00.

## II.

### Freedom of the Press Issue

Petitioners allege that their First Amendment rights were violated by the court's action. This Court has spoken on the issue of the rights of reporters versus the necessity for maintaining an orderly judicial process, and we refer the reader to the case of Ex Parte Davis, 171 Tex.Cr.R. 629, 353 S.W.2d 29 (1962). There, we stated that we "do not deny the trial court the right to punish for contempt a reporter for conduct *in the presence of the court* which interferes with orderly proceedings in the administration of justice." [Emphasis added]

In the Davis case, this Court held unconstitutional an order purporting to bar one reporter from entering an area of the courtroom inside the rail while continuing to allow other individuals similarly situated to come within this area.

This Court has always recognized the right to a free press, a valuable right of the people and one to be protected and maintained. Ex Parte Aldridge, supra. This same Aldridge case discussed the test generally applied in cases involving questions of First Amendment rights. The "clear and present danger" test states that freedom of the press shall not be impaired through the exercise by state courts of contempt proceedings unless there is a clear and present danger that the utterances in question present a serious and imminent threat to the due administration of

Judge Douglas wrote the opinion and declared that a person inside a restroom stall that had no doors could not reasonably expect privacy. This Court stated that where "the design is such that there is no right to expect privacy there can be no invasion of privacy."

9. Of course, where there is a violation of an injunctive order, contempt of court arises and the court's power to punish is inherent. General Southwestern Corporation v. State, 333 S.W.2d 164 (C.C.A.Houston, 1960) writ ref., n. r. e.

justice. The "utterances" in question in this present case were the public revelation of the agent's identity. However, as stated before, we must conclude that when the agent took the stand in a courtroom open to the public, he waived any question as to his identity as an agent.

■ Further, there can be no constructive contempts of court with reference to publications reflecting on the court or the judge thereof unless the publication is not only of a defamatory character, but is also untrue, and relates to some particular case then pending, and is calculated to embarrass the court in the trial or disposition thereof. Ex Parte Green, supra. No part of such a test has been met in the case now before this Court. As to other publications not relating to a pending case, no matter how defamatory the language used may be with reference to the court or the judge thereof, this will not constitute a contempt, because it cannot be regarded as calculated to interfere with the administration of justice. Ex Parte Green, supra.

### III.

#### *Conclusion*

■ The relators, in violation of no court order, took pictures of a narcotics agent. The agent testified he was held up by the forearms "for a couple of seconds" while this happened. Another agent at the scene corroborated this, though other persons there in the hallway did not. The State introduced an "underground" newspaper, in which these photographs appeared. The copies of those pictures are before this Court; they are of poor quality, but they reflect a smiling, unrestrained agent Harden. It is apparent that if the agent had wished to pursue this restraint matter, he had an adequate remedy in a civil action for assault, or by a criminal assault complaint.

We are certainly aware of the necessity for a judge of a court to preserve order and decorum, demand respect and enforce its mandates and decrees.

> "There can be no doubt that the judge has the right to punish for contempt, and yet this right is not given for the private advantage of the judge but to preserve that respect in regard to which the court cannot be deprived and maintain its usefulness. . . . extreme caution is required that the judge in redressing a public wrong does not also find revenge for his private grievances." Ex Parte Davis, supra.

The power to punish for contempt should only be exercised with caution. Willson v. Johnston, 404 S.W.2d 870 (C.C.A. Amarillo, 1966) no writ history; also, contempt is not to be presumed, but on the contrary is presumed not to exist. Ex Parte Elmore, 161 Tex. 585, 342 S.W.2d 558 (1961).

The burden of proof in a contempt proceeding is "beyond a reasonable doubt." Ex Parte Cragg, 133 Tex.Cr.R. 118, 109 S.W.2d 479 (1937). We are of the opinion that the evidence in this present case wholly fails to meet the measure of the law. The evidence is not sufficient to show contempt on the part of the relators in this present case, and the trial judge abused his discretion in so holding. That judge uniquely held the relators to be in contempt, both directly and constructively. The record substantiates neither.

The writs are granted and the charges against the relators are ordered dismissed.

ODOM, Judge (concurring).

Petitioners have each applied to this Court for a writ of habeas corpus, attacking the validity of the judgment in Criminal District Court No. 5 of Dallas County, holding them in contempt of court and adjudging their punishment at six months confinement in the county jail and a $500.00 fine, each.

I find myself unable to concur in the reasoning of either the majority opinion or

the dissenting opinions, and therefore find it necessary to express my own opinion on the matters raised by the application before this Court.

The affidavit upon which the order to show cause issued recites that petitioners:

" . . . did unlawfully interfere with and intimidate a sworn witness to wit: Robert Hardin, in a Criminal case then being tried, to wit, The State of Texas v. Travis Wayne Boykin. The Court having placed the said Robert Hardin under the Rule of Evidence and Robert Hardin having previously testified with expectation of again testifying, the Court released the jury for lunch. At approximately 1:15 P.M., Robert Hardin and two other witnesses returned to the third floor by using the elevator. As Robert Hardin exited the elevator and turned into the hall leading to the Court, John Doe, previously in Court when Robert Hardin testified directed the attention of John Arnold and Brent Stein to Robert Hardin. John Doe and John Arnold physically restrained Robert Hardin from turning or shielding his face from the camera that Brent Stein was taking his picture with. Despite Robert Hardin's attempt to avoid having his picture taken and to leave he was physically restrained by John Doe, John Arnold, and Brent Stein and more pictures were taken. . . ."

Following notice and hearing, the court entered the following findings of fact and conclusions of law:

"[1] The Court finds that the defendant John D. Arnold and one John Doe apprehended State Narcotic Agent, Robert Harden in the hall outside of this courtroom and held him while defendant, Brent Stein took pictures of the said Robert Harden.

"[2] The Court further finds that Agent Robert Harden was the State's major witness in the trial of a number of narcotic cases against one Travis Wayne Boykin, then going on in this Court.

"[3] The Court further finds that the defendants, John D. Arnold, Brent Stein and John Doe willfully sought to intimidate a State's material witness, to wit, Robert Harden, who was and is an under cover agent for the Texas Department of Public Safety.

"[4] The Court further finds that the defendants are guilty of knowingly endangering the life of the State's witness, Robert Harden; that the defendants are guilty of interfering with the authority and the jurisdiction of this Court.

"[5] The Court further finds that the defendants are guilty of conduct tending to belittle, interrupt, interfere with and embarrass the administration of justice in this Court and the administration of justice generally.

"The Court therefore holds the defendants John D. Arnold and Brent Stein guilty of both constructive and actual contempt."

In Vogler, Ex parte, 110 Tex.Cr.R. 579, 9 S.W.2d 733 (1928), it was stated:

"The Court cannot make contempt of that which is not contempt, and if, 'upon a review of the whole record, it appears that a judgment unwarranted by law was entered, the party thus placed in contempt will be released under the writ of habeas corpus.' Ex parte Duncan, [42 Tex.Cr.R. 661] 62 S.W. [758] 761. . . . When the facts do not constitute contempt, the court is without authority to enter the particular judgment."

And on motion for rehearing therein:

"Our courts in Texas have gone so far as to hold that, on habeas corpus testing the soundness of contempt judgments, the court may go into the truth of the recitals of the judgment, and that its recitals are not conclusive on the question of the authority of the court to render it,

and also that the recital of facts in such judgment adds nothing to its sanctity."

The fourth paragraph of the court's findings states that petitioners "are guilty of knowingly endangering the life of the State's witness." There was no allegation of such in the affidavit by which petitioners received notice of what they would be required to defend against; there is no evidence that the complained of conduct did endanger the life of the State's witness; and even if such had been the case, unless there were proof that such action was done with the intent to influence the witness' testimony at the pending trial, I fail to see how such conduct would constitute intimidation of a sworn witness in contempt of court.

Turning now to the other findings, the allegation in the affidavit is that petitioners "did unlawfully interfere with and intimidate a sworn witness to wit: Robert Hardin, in a Criminal case then being tried, to wit, The State of Texas vs. Travis Wayne Boykin." I do not see how any such contempt as herein alleged can be proven without proving that the accused *acted with the intent* to influence the witness to alter or withhold testimony or in some other way fail to carry out what was expected of him as a witness in the pending trial. See and compare Art. 428a, Vernon's Ann.P.C. Intimidation of a witness could be contemptuous as such only if the individual is intimidated *in his capacity* as a witness.[1] Furthermore, it is not the effect upon the witness, but the intent of the intimidator, which is controlling. See also 12 Tex.Jur.2d, Contempt, Sec. 47.

In the instant case there is no evidence that either of the petitioners before this Court had the intent to interfere with or intimidate Harden in his capacity as a witness in the trial alleged on the day of the alleged acts, nor is there any such finding. It is therefore my opinion that the contempt alleged was not shown and the relief sought should be granted.

ONION, P. J., also joins in this concurring opinion.

MORRISON, Judge (dissenting).

I cannot agree to the granting of these writs. My views are expressed in Ex parte Aldridge, 169 Tex.Cr.R. 395, 334 S. W.2d 161. A judge should have the authority to protect a witness who appears before him, at least while the witness is in the court house.

I dissent.

DOUGLAS, Judge (dissenting).

Relators attack the validity of the judgment holding them in contempt of court and adjudging their punishment at six months' confinement in the county jail.

On April 6, 1972, relators, accompanied by a third individual whose name was not revealed but who was referred to as "John Doe," attempted to take pictures of Officer Robert Harden, an undercover agent for the Texas Department of Public Safety. Officer Harden, on the date of the occurrence of the act for which relators were held in contempt, had been testifying as the State's chief witness in a trial being conducted in Criminal District Court No. 5. The events constituting the alleged contemptuous conduct occurred as Officers Harden, Floyd and Maxwell were returning to the courtroom following the noon recess. As the three officers stepped from the elevator into the hall outside the court-

---

1. Consider Y, a court stenographer, discovering that X, who happens to be a witness, has been secretly meeting with Y's spouse, and during a recess Y threatens to kill X if X meets Y's spouse again. I hardly see how this would be contempt of court if the trial at which X is testifying is unrelated to the subject of the threat, and this regardless of the fact that Y knows X is a witness, and regardless of the effect upon X's mental state and composure as a witness. The intent to interfere with or intimidate X *in his capacity* as a witness is lacking.

room, the unnamed man, "John Doe," pointed to Officer Harden and said, "That's the man." At this point, relator Stein, known also as Stoney Burns, began taking pictures of Officer Harden. When requested not to take pictures, he persisted. As Officer Harden attempted to put his arm in front of his face, Arnold and "John Doe" grabbed Officer Harden's arms and held them to his side so that Stein could continue to take photographs. The court was immediately informed of the events which had taken place and Arnold, who was seen standing outside the courtroom, was brought before Judge Ed Gossett and held in contempt. Arnold's motion for new trial was granted and both Arnold and Stein were ordered to appear before the court and show cause as to why they should not be held in contempt.

Initially, relators allege that the affidavit is defective in that the facts of the case do not support a finding of direct but only constructive contempt, because the facts alleged and established occurred neither within the immediate view of the court nor in the presence of the court. They contend that since the facts show constructive contempt only, the affidavit is insufficient because it does not show knowledge on the part of the contemners. The affidavit in question, omitting the formal parts, reads as follows:

". . . that one Brent LaSalle Stein, John Arnold, and John Doe, hereinafter styled Defendant, heretofore, on or about the 6th day of April A.D.1972, in the County of Dallas and State of Texas, did unlawfully interfere with and intimidate a sworn witness to wit: Robert Hardin, in a Criminal case then being tried, to wit, The State of Texas vs. Travis Wayne Boykin. The Court having placed the said Robert Hardin under the Rule of Evidence and Robert Hardin having previously testified, with expectation of again testifying, the court released the jury for lunch. At approximately 1:15 P.M., Robert Hardin and two other witnesses returned to the third

floor by using the elevator. As Robert Hardin exited the elevator and turned into the hall leading to the Court, John Doe, previously in Court when Robert Hardin testified directed the attention of John Arnold and Brent Stein to Robert Hardin. John Doe and John Arnold physically restrained Robert Hardin from turning or shielding his face from the camera that Brent Stein was taking his picture with. Despite Robert Hardin's attempt to avoid having his picture taken and to leave he was physically restrained by John Doe, John Arnold, and Brent Stein and more pictures were taken. . . ."

The affidavit is sufficient to allege contemptuous conduct. A direct contempt consists of words spoken or acts committed in the presence of the court or during its intermissions which tend to subvert, embarrass, or prevent justice. 17 Am.Jur.2d, Contempt, Section 6. The court's power to effect orderly administration of justice extends beyond the confines of the courtroom. 100 ALR 2d 1409, Section 2 Anno. Trial—Press, Radio, Television. The conduct complained of here occurred in the corridor outside the courtroom and was "therefore" in close enough proximity to be considered as occurring in the presence of the court. See 17 Am.Jur.2d, Contempt, Section 6 and cases cited therein. Generally, contempt is deemed to have been committed in the presence of the court if acts so constituting the contempt were committed in the corridors adjacent to the courtroom or even on the courthouse steps or lawn. See 17 C.J.S. Contempt, § 26 and cases cited therein.

The press has full liberty to obtain material for its publications by any method that it deems best, provided such method is not illegal. It is fully recognized that the general public, which seldom visits a court, can be and should be well served by the newspapers in giving full and accurate accounts of what occurs in and about the courts. However, the court has an inherent right to conduct its work and its ses-

sions without disturbance of any sort. If a court could not guard against disturbance, then it could be pursued by disturbance to a point where it would no longer be able to function. So it is evident that this right to sit and proceed undisturbed is a right necessary to the liberty of the people for whose protection the courts have been created. In re Seed, 140 Misc. 681, 251 N.Y. S. 615 (1931).

Judge Harris, in the case of In re Seed, supra, was dealing with the situation in which a newspaper photographer had taken pictures of prisoners in the corridors against his order. He stated that the taking of pictures of prisoners could lead to riot in the halls and corridors adjoining the court, especially when taken against the desires of the prisoners. Such disturbance could lead to the release or escape of a prisoner. He went on further to state:

> "This line of reasoning, that disorders may arise and harm may come from the taking of pictures in the vicinity of the courtroom, does not necessarily confine itself to the taking of pictures of those indicted for crime. Persons interested in civil litigation, either as parties or called as witnesses, have a right to approach the court undisturbed and one can readily see that a picture which compels a litigant or a witness to run a barrier of cameras, with attendant noises, would lead to such parties relinquishing their right to approach the courts, and would result in witnesses being kept away from the court. This court has no doubt that a party to a lawsuit, or a witness, would have a right to object to his picture being taken, and such objection could in the future, as it has sometimes in the past, *lead to fisticuffs and similar disturbing occurrences.*" (Emphasis supplied)

A logical extension of Judge Harris' reasoning would cover criminal as well as civil cases. The ill sought to be prevented under his decision, ". . . *fisticuffs and similar disturbing* . . ." did occur in the present case. Also, while the wit-

ness Harden was not kept away from the courtroom by direct means, he was constructively kept away since the evidence shows that his demeanor as a witness was affected. Harden feared that publication of his picture would endanger his life.

Furthermore, the affidavit states that one of the contemnors, "John Doe," was in the courtroom early in the morning which is sufficient to show that contemnors knew or should have known that all witnesses had been placed under the rule of evidence and as such were under the order of the court. The facts as stated in the affidavit are sufficient to allege constructive contempt as well as direct contempt. The record also reflects that relators appeared before the court with counsel on April 7, 1972, and were instructed by Judge Gossett to appear on April 21, 1972, and show cause why they should not be held in contempt of court.

Next, relators contend that the evidence is insufficient to support the findings of the court.

Officer Harden testified that as he and his fellow officers stepped from the elevator into the hallway, he was greeted by a man who had been in the courtroom earlier that morning listening to the testimony of the trial in which he, Harden, was testifying. He related that after the man greeted him by saying "Hello," and he returned the greeting, the individual then said, "That's him." At that moment, relator Stein took a picture of Officer Harden. Harden continued testifying stating that he told Stein, "I don't want my picture taken." After he made the statement, "John Doe" and Arnold approached him from the left and right, respectively. He stated that as he attempted to put his arm in front of his face, both men grabbed his arms and pulled them to his side. He testified that he broke away after a couple of seconds and then asked the three men to remain and speak to the judge. As Officer Floyd started to see if the judge was in his chambers, Arnold stepped in front of him.

Floyd pushed Arnold to the side and told him that if he interfered again he would be charged with assault.

Officer Harden continued his testimony by testifying as to the effect this incident had on him while he was testifying at the afternoon session. He stated that in his capacity as an undercover agent he had made several cases involving narcotics, and that it would endanger his life for his picture to be published as well as the cases which had not yet been brought to trial. Officer Harden testified that while he was a witness in the afternoon session he was more concerned about the event that had transpired outside the elevator than the testimony he was giving, because if the picture were published in the newspaper, it would have endangered his life and the security of his job not only in the Dallas area but statewide.

Officer Floyd testified that he was the supervising agent of Officer Harden and that in his opinion Harden's demeanor as a witness was affected by the events which had taken place. He stated that threats had been made on Officer Harden's life and publication of his picture in an underground newspaper would not only jeopardize his life but would limit his undercover work in Dallas and surrounding areas.

Officer Maxwell then testified substantially the same facts as Officer Harden did.

Next, Emma Parker, an aunt of Travis Wayne Boykin, at whose trial Officer Harden was testifying, testified that she observed a scuffle outside the elevator and observed Officer Floyd push Arnold to the side. She stated that the other officers seemed to be pushing away or trying to push back away from Stein as Stein was attempting to take their pictures, but that she could not remember if "John Doe" was anywhere near Officer Harden.

Travis Boykin testified that he was in the hallway outside the courtroom during the noon recess and that he had observed relators in the hallway. He also stated that Stein had a camera with him and that he heard them discussing taking photographs but that he was not aware of whom. He testified that he observed some scuffling but could not see what was going on, yet he did observe Officer Floyd push Arnold against the wall. Boykin also related that Arnold continued to state, "Here is my press card," "Am I under arrest," or words to that effect and that at no time did he see anybody hold anybody. His wife, Helen Boykin, testified and gave substantially the same version as her husband did.

Arnold testified that he was the news editor for "Iconoclast," a news publication by Reliable Sources, Incorporated. He testified that he and Stein had been called by an unidentified individual who later turned out to be "John Doe," and were told that they might be able to get a picture of Officer Harden. Arnold stated that he was shoved by Officer Floyd but at no time did he grab Officer Harden. Stein also testified that at no time during the picture episode did anyone attempt to restrain Harden but that Harden had grabbed his own arm to prevent him from taking pictures.

The evidence presented is sufficient to support a finding of contempt. Generally, those whose conduct tends to bring the authority and administration of law into disrespect or disregard, interferes with or prejudices parties or their witnesses during a litigation, or otherwise tends to impede, embarrass or obstruct the court in discharge of its duties are guilty of contempt. Ex parte Norton, 144 Tex. 445, 191 S.W.2d 713; 12 Tex.Jur.2d, Contempt, Section 12. The facts here show that not only was the life of one of the State's witnesses endangered, but that such witness was a critical witness who should not have been interfered with in any manner while the trial was being conducted.[1] Interference of the

---

1. Relator Arnold and Doug Baker, Jr., publishers of the "Iconoclast" both testified

that the publication of Officer Harden's pictures in their opinions would not endan-

nature involved here is not only detrimental to the trial in process but also impedes the court in the administration of justice. See Ex parte Aldridge, 169 Tex.Cr.R. 395, 334 S.W.2d 161.

I would hold that the orders of contempt are valid and that the relief sought under the application for writ of habeas corpus should be denied.

ger his life. Yet, the article concerning Officer Harden, which appears in the record, contains a statement by Wayne Boykin to the effect that Berclay McClinton, who allegedly kept Officer Harden supplied with narcotics, might possibly lose her life because it may not be known to all that she was unaware of Officer Harden's undercover activities. Also, Gene L. Mitchell, a reporter of WFAA television station, called as a witness by relators, testified that he would not allow a picture of an undercover agent to be shown on his television station without the agent's consent. Charles Davis Coleman, Dallas Bureau Chief for Channel 11, KTUT television station, also called as a witness by relators, testified essentially the same as Mitchell.