**In re Betty Brock BELL, Judicial Disciplinary Proceeding.**

Special Court of Review, Appointed by the Supreme Court.

Feb. 17, 1995.

Betty Brock Bell, pro se.

Mike Discoll, Harris County Atty., Cedric K. Loeb, Deputy Div. Chief, State Trial Div., Harris County Atty's. Office, Houston, for appellant.

State Com'n on Judicial Conduct, Austin, for appellee.

Robert C. Flowers, Executive Director, William E. Hornung, Gen. Counsel, Austin, for appellee (Examiners).

Before WALKER, P.J., and LARSEN and JONES, JJ.

## OPINION

LARSEN, Justice.

Judge Betty Brock Bell appeals her public admonition issued by the State Commission on Judicial Conduct. Appeal is by trial de novo to a special court of review [1] appointed by the Texas Supreme Court.

## BACKGROUND

Betty Brock Bell is Justice of the Peace for Precinct Seven, Place One, Harris County, Texas. On November 15, 1993, a man confronted her in the hallway near her courtroom, telling her it was a disgrace for her to be over an hour late to court after lunch,

---

1. The special court of review consists of Chief Justice Ronald L. Walker of the Ninth Court of Appeals, Beaumont, designated presiding justice; Justice Susan Larsen, Eighth Court of Appeals, El Paso; and Justice J. Woodfin Jones, Third Court of Appeals, Austin.

leaving all the citizens with business in her court waiting. Judge Bell immediately held the man in direct contempt, committed him to jail for three days, and fined him $100, the maximum punishment a justice of the peace may assess.[2] The same day, a higher court issued a writ of habeas corpus for the man's release and later withdrew the writ on November 24, 1993. Judge Bell reissued the arrest order on January 10, 1994.

The State Commission on Judicial Conduct began an inquiry into this matter on November 30, 1993, when it received a complaint from a citizen of Spring, Texas, which read in its entirety:

> If the attached article is factual, then Justice of the Peace Betty Brock Bell needs to be removed from the bench immediately, before she can make any more of a mockery of the judicial system.

Attached to the letter was a newspaper article describing the incident between Judge Bell and the man in the hallway. The judicial commission requested a written response from Judge Bell, which she supplied. The commission made further inquiry including contact with the attorney of the man held in contempt, who at that time also filed a complaint in writing. Judge Bell appeared before the commission in person, and filed further written response to the complaint. The commission issued a public admonition, finding that Judge Bell had wilfully violated several provisions of the Code of Judicial Conduct. Judge Bell appealed.

## PROCEDURE FOR JUDICIAL CONDUCT INQUIRY

The Texas Constitution provides that any judge[3] may be removed from office, disciplined, or censured for:

> [W]illful or persistent violation of rules promulgated by the Supreme Court of Texas, incompetence in performing the duties of the office, willful violation of the Code of Judicial Conduct, or willful or persistent conduct that is clearly inconsistent with the proper performance of his duties or casts public discredit upon the

judiciary or administration of justice. TEX. CONST. art. 5, § 1–a(6)(A).

The Texas Government Code, together with rules promulgated by the Texas Supreme Court by constitutional authority, outlines the procedure for conducting an investigation into alleged misconduct by a judge. TEX. GOV'T CODE ANN. § 33.001; RULES FOR THE REMOVAL OR RETIREMENT OF JUDGES, 56 TEX. B.J. 823 (1993), Rule 1. This is the procedure that has been followed in Judge Bell's case.

■ A preliminary investigation may be initiated by the commission's receipt of a written complaint, upon its own motion, or otherwise. RULES FOR THE REMOVAL OR RETIREMENT OF JUDGES, 56 TEX.B.J. 824 (1993), Rule 3(a); *see also In re Thoma* 873 S.W.2d 477, 483 (Tex.Rev.Trib.1994). If preliminary investigation reveals that the allegations are frivolous or unfounded, the commission terminates proceedings. RULES FOR THE REMOVAL OR RETIREMENT OF JUDGES, 56 TEX.B.J. 824 (1993), Rule 3(b). If the commission determines there is sufficient cause to believe that the charges may have merit, the commission institutes a full investigation with notice to the judge in writing. The commission may request the judge's response. *Id.* Rule 4. The commission has subpoena powers for purposes of conducting its investigation, and the commission may offer the judge an opportunity to appear before it informally during such investigation. *Id.* Rule 5(a) and 6(a). Upon completion of its investigation, the commission may dismiss the complaint, issue a private or public admonition, warning, reprimand, or require that the judge obtain additional training or education, or institute formal proceedings concerning public censure, removal, or retirement. TEX. CONST. art. 5, § 1–a(8). If the commission determines that an informal sanction is appropriate, it notifies the complainant and judge in writing. TEX.GOV'T CODE ANN. § 33.033. Upon receipt of any type of sanction (but not a decision to institute formal removal proceedings) a judge may file with the chief justice of the Texas Supreme Court, within

---

**2.** TEX.GOV'T CODE ANN. § 21.002(c) (Vernon 1988).

**3.** A "judge" means a justice, judge, master, magistrate, or retired or former judge. TEX.GOV'T CODE ANN. § 33.001(a)(2).

thirty days of the commission's issuance of the sanction, a written request for appointment of a special court of review. TEX.GOV'T CODE ANN. § 33.034(b); RULES FOR THE REMOVAL OR RETIREMENT OF JUDGES, 56 TEX.B.J. 825 (1993), Rule 9(a). The chief justice then selects a special court of review by lot within ten days, which court is composed of three court of appeals justices not serving in the district in which the petitioning judge serves, nor serving on the judicial commission. TEX. GOV'T CODE ANN. § 33.034(c). The commission files with the petitioner and each justice a charging document within 15 days after selection of the court of review. TEX.GOV'T CODE ANN. § 33.034(d). The special court of review holds a trial de novo within 30 days of filing of the charging document. The court issues its decision as to the proper disposition of the appeal within sixty days of the trial de novo. TEX.GOV'T CODE ANN. § 33.034(h). The special court of review's decision is not appealable. TEX.GOV'T CODE ANN. § 33.034(i).

### *THE JUDICIAL COMMISSION'S CHARGE*

The judicial commission charged that Judge Bell wilfully violated several provisions of the Code of Judicial Conduct,[4] which provide:

A judge shall comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. 2A

A judge should be faithful to the law and shall maintain professional competence in it. A judge shall not be swayed by partisan interests, public clamor, or fear of criticism. 3B(2)

A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity.... 3B(4)

A judge should dispose of all judicial matters promptly, efficiently and fairly. 3B(9)

The commission found that Judge Bell had violated each of these canons, and made such conduct the subject of a public admonition. We review that decision de novo.

### *FACTS*

We find the following facts were established by a preponderance of the credible evidence at the trial de novo held in this cause December 20, 1994.

Bruce Caress is a businessman in Stafford, Texas. On November 15, 1993, he was in Betty Brock Bell's courtroom on behalf of his stepson, Ryan Sheiner, who had been charged with the misdemeanor offense of minor in possession of alcohol. Mr. Caress was at court to request a continuance on behalf of his stepson, who was attending school in Austin and had a test the day his court appearance was scheduled. Ryan Sheiner and his co-defendant had hired a Houston lawyer, Jack Lee, who was also present to request a continuance on behalf of both young men.

Judge Betty Brock Bell had tried a civil case that morning that lasted until noon. She went to lunch following the completion of that case, despite the scheduling of approximately twenty criminal cases for trial at 12:30 p.m. that day.[5] Judge Bell does not normally take the bench for the calling of her docket, in any event, but has instructed her court clerk to call the names of all defendants. The clerk does not call court to order

---

4. The relevant standards of conduct cited by the commission in its original charging document became effective March 1, 1994, by order of the Texas Supreme Court and thus were not in effect on November 15, 1993, when Judge Bell engaged in the conduct which we are here examining. In a hearing held before commencement of the trial de novo before this special court of review, the commission moved to supplement its charging document to include the canons in effect on the relevant date. The special court of review determined that there were no substantive differences in the relevant canons, but simply small changes in terminology and numbering, and that there-

fore no surprise or prejudice to Judge Bell would result from the supplementation. The commission's motion to supplement was granted. The supplemental charge cites to the Code of Judicial Conduct in effect in November 1993, Canons 2A, 3A(1), 3A(3) and 3A(7).

5. Notices to defendants of trial settings tell them to be in court for trial at 12:30 p.m. They are on Judge Bell's stationery and are signed by her court clerk. They do not contain an explanation of any delay defendants may expect once they arrive at court.

or explain the procedure at that time, she simply begins calling names. No one in Judge Bell's court tells defendants when they might expect to speak with the judge.

On November 15, after their names were called, defendants were asked to confer individually with the assistant district attorney in the jury room across the hall from the courtroom. This, too, is the usual procedure for Judge Bell's criminal trial docket. The purpose of this interview is to work out plea bargains, discuss motions for continuance, and the like. Only after the assistant district attorney has spoken with everyone on the docket will Judge Bell take the bench, usually between 2 and 3 p.m. for a 12:30 p.m. trial docket. No one presides over the court until that time; no one explains this procedure to waiting defendants. All defendants, and their attorneys if they have them, are generally required to wait until the assistant district attorney has finished with the entire docket before the court takes up any business at all.

On this particular day, Mr. Lee and one other attorney (Mr. Ronald Mock, representing his mother-in-law on a speeding ticket) had business on Judge Bell's docket; everyone else was pro se. The two attorneys, who knew Judge Bell by sight, saw her arrive back from lunch around 1:45 p.m. Mr. Mock called to her, asking if he could visit with her about his case, as the ticketing officer was not present and he wanted to move for dismissal. Judge Bell agreed to talk with Mr. Mock in the jury room where the district attorney was talking with defendants. She entered the jury room, discussed the case with Mr. Mock and Assistant District Attorney Lester Blizzard, granted the State's oral motion for continuance, and denied Mr. Mock's oral motion to dismiss. While in the jury room, she was next approached by Mr. Lee, who requested a deferred adjudication or alternatively a continuance for his clients. Judge Bell denied Mr. Lee's motion and granted the State's motion to forfeit the bonds in both cases. Mr. Lee made a remark that Judge Bell took exception to, and she told him, "Counsel, I don't appreciate those remarks. Conduct yourself professionally, or I'll report you to the State Bar." Mr.

Lee "mumbled something" and left the jury room. Judge Bell then also left the jury room, heading across the hallway to her chambers.

While she was in the hallway, Judge Bell was approached by Mr. Caress, who had been waiting in the courtroom since 12:30 p.m. At the time he approached her Judge Bell was alone, crossing the hallway, not speaking to anyone. She was not conducting court business. Mr. Caress called "your honor," Judge Bell turned around, and he stepped within three feet of her. Mr. Caress testified:

> I told her that I felt her actions were irresponsible and disrespectful. That she had left a courtroom full of people sitting there for over an hour and a half, people who had jobs and had other places to be, that needed to be working for a living, not sitting here in a courtroom while she had lunch.

He did not physically or verbally threaten the judge; although he was certainly critical and assertive, we do not find that his statements were rude or insolent. Nevertheless, at this point the judge stated "I'll show you how long I can keep you here in this courtroom," and she ordered her bailiff to arrest him. We find the judge did not warn Mr. Caress to cease his criticisms upon danger of being held in contempt, nor did she give him the opportunity to leave the courthouse before ordering his confinement. The conversation between Judge Bell and Mr. Caress was momentary.

Judge Bell then retired to chambers and began drafting a "judgment and commitment for direct contempt." It read:

> WHEREAS, on this the 15th day of November, 1993, in open court and in the presence of the judge thereof, and while said court was engaged in its regular business, hearing and determining causes pending before it, one BRUCE STEVEN CARESS was guilty of contemptuous behavior in the immediate view and presence of said court in the following respects, to wit:

> Approached the Judge and said in a very loud and angered manner "ITS [sic] A DISGRACE A PERSON HAVE [SIC] TO

WAIT AN HOUR FOR YOU TO RETURN FROM LUNCH AND THEN YOU EXPECT THEM TO RETURN FOR ANOTHER COURT DATE. I'M NOT COMING BACK HER [sic] AGAIN—YOU SHOULDN'T TELL PEOPLE TO BE HERE AT 12:30 AND THEN YOU GO TO LUNCH—WHO DO YOU THINK YOU ARE?"

NOW, THEREFORE, the said BRUCE STEVEN CARESS still being present in court, it is ORDERED, ADJUDGED and DECREED by this court that he, the said BRUCE STEVEN CARESS, by reason of the aforesaid acts, was and is guilty of contempt of this court committed in its presence on the above stated date, and it is, accordingly, ORDERED that the said BRUCE STEVEN CARESS be punished by a fine of $100.00 and by confinement in the county jail of HARRIS County, Texas, for 3 days, and it is further ORDERED that the said BRUCE STEVEN CARESS be and is hereby committed to the custody of the Sheriff of HARRIS County, Texas, until this judgment is satisfied, or until further orders of this court.

RENDERED and SIGNED this the 15th day of NOVEMBER, 1993.

Before rendering judgment on the contempt, Judge Bell consulted with the presiding justice of the peace for Harris County, and also with the judge who had taught contempt at justice of the peace school. They both agreed that she was within her rights in holding Mr. Caress in contempt, but it is unclear whether Judge Bell represented to them that court was in session as is stated in her judgment, or whether she explained that the discussion with Mr. Caress took place in a hallway, and that it did not interrupt or impede any business of the court. Judge Bell also asked the Harris County Attorney's office to review her judgment, and that office approved its form. Judge Bell never held a hearing on Mr. Caress's contempt. She testified that she did not believe this was necessary, as she had been taught that "open court" could mean any time and any where that court proceedings were taking place,

whether in chambers, in the jury room, or where ever she chose to conduct court business. It is undisputed that all court business scheduled for that day was disposed of, that nothing was reset because of the incident with Mr. Caress, that no mistrials were declared nor juries discharged.

Later that afternoon, Mr. Caress's business attorney, David Smith, came to Judge Bell's court and asked for a hearing, that bond be set, and that Judge Bell review the cases he had found indicating Mr. Caress could not be guilty of direct contempt. She refused to do any of these things stating, "No, I don't want to see the cases. I may be wrong in the law, but he was disrespectful to me, and he will be going to jail." She also told Attorney Smith that Mr. Caress would have to serve his full three days confinement.

Mr. Caress was released by order of County Criminal Court at Law Number 13 on writ of habeas corpus that same day. The order releasing him, in the County Court at Law Judge's handwritten notation, stated "Judge Bell or another to conduct further hearing after release if so ordered." That judge withdrew his order on November 24, 1993. Despite the admonition that a hearing be held, Judge Bell entered an alias commitment for Mr. Caress's arrest for direct contempt on January 10, 1994.

These facts, and the commission's charging document, raise a number of issues that are matters of first impression in the context of a judicial disciplinary proceeding.

### JUDGE BELL'S FAILURE TO PRESIDE OVER DOCKET CALL

■ The first issue we must decide is whether Judge Bell's habit of allowing her court clerk and the assistant district attorney to run proceedings in her court, herself taking the bench for the first time one to two hours after she has ordered litigants to be present, constitutes a wilful violation of the Code of Judicial Conduct.[6] Specifically, Judge Bell is charged with violating those Canons which require a judge to be "patient,

6. The judicial commission concluded that "Judge Bell's actions in customarily not being personally present to commence court with the calling of

the docket are contrary to the provisions of Canon 2A, [3]B(4) and 3B(9) of the Code of Judicial Conduct."

dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom he or she deals in his or her official capacity," and to "dispose of all judicial matters promptly, efficiently and fairly." We find that Judge Bell did not wilfully violate those Canons by the manner in which she runs her court, and we therefore dismiss that portion of the charge against her.

In reaching this conclusion, this special court of review does not condone the manner in which Judge Bell elects to run her criminal trial docket. Indeed, we believe that the lack of a presiding judge to explain what proceedings and delays the defendants on her docket might expect led directly to the difficulties between Judge Bell and Mr. Caress; difficulties that could have been avoided had Judge Bell taken a few minutes, robed and on the bench, to determine motions and explain that the district attorney would speak with the defendants before she would call cases to trial. We believe that the practice which Judge Bell uses is confusing and the likelihood for misunderstandings and angry reactions is needlessly great. There must be a better way to run a justice of the peace criminal docket.

Nevertheless, Judge Bell presented evidence that she too was dissatisfied with this procedure, but that the Harris County district attorney's office has asked for time to speak with each defendant before cases in justice court proceed to trial. Indeed, Harris County's chief justice court prosecutor testified that all but one Harris County justice court proceeds in exactly this fashion, and that prosecutors have met twice with Judge Bell, at the judge's request, to discuss what might be done to facilitate proceedings in criminal cases. Judge Bell testified that on one occasion, also at her request, the district attorney's office sent out a second prosecutor to help move the cases faster, but the prosecutor did not return and no permanent solution to the habitual delay has been found.

■ In determining whether Judge Bell's acts are subject to discipline, we must decide whether they were a *"wilful* violation of . . . the Code of Judicial Conduct." TEX.GOV'T CODE ANN. § 33.001(b)(2) [emphasis added]. Wilful conduct is the intentional or grossly indifferent misuse of judicial office, involving more than an error of judgment or lack of diligence. *In re Thoma*, 873 S.W.2d at 489. Wilful conduct requires a showing of bad faith, including a specific intent to use the powers of office to accomplish an end which the judge knew or should have known was beyond the legitimate exercise of authority. *Id.* We have found no authority, and the commission has pointed us to none, that requires a judge to be physically present and presiding over docket call or pre-trial conferences between defendants and prosecutor. The better practice would certainly be to inform the defendants that there would be such conferences before trial began, and to insure that defendants who had matters that the judge must address were heard before such conferences commenced. Nevertheless, under these facts, we find that the commission has not met its burden of showing that Judge Bell wilfully violated the Code of Judicial Conduct in customarily not being present to commence court with the calling of the docket. That charge is dismissed.

### JUDGE BELL'S ACTS IN HOLDING BRUCE CARESS IN CONTEMPT

The next issue we must decide is whether Judge Bell's response to a personal criticism, by holding Bruce Caress in direct contempt, and later characterizing his actions as having been done in open court, were wilful violations of the Code of Judicial Conduct.[7] Specifically, Judge Bell is charged with violating those Canons which require that a judge be faithful to the law and maintain profession competence in it, not be swayed by partisan interests, public clamor, or fear of criticism,

---

7. The judicial commission concluded that "Judge Bell's action in responding to a personal criticism, voiced outside the courtroom and when court was not in session, with a finding of direct contempt of court, jail sentence, and fine was contrary to Canons [3]B(2) and [3]B(4);" and "Judge Bell's statement, in her original Judg-

ment and Commitment for Direct Contempt, that Court was in session, engaged in its regular business of hearing and determining causes pending before it, when in fact the confrontation occurred in a hallway and court was not in session, was contrary to Canon 2A of the Code of Judicial Conduct."

shall be patient, dignified and courteous, and shall comply with the law and act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

### 1. Was Mr. Caress's conduct contumacious?

 Contempt power is a necessary and integral component of judicial authority. *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911); *Ex parte Daniels*, 722 S.W.2d 707, 709 (Tex. Crim.App.1987). Although the exercise of this authority should be tempered with common sense and sound discretion, nevertheless we accord the judge's contempt power wide latitude because it is essential to judicial independence and authority. *Daniels*, 722 S.W.2d at 709; *Shillitani v. United States*, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). Contempt has been defined as an act which is reasonably calculated to impede, embarrass, or obstruct the court in the discharge of its duties. *Ex parte Soape*, 171 Tex.Crim. 251, 347 S.W.2d 621 (1961). The essence of "contempt" requires conduct that obstructs or tends to obstruct the proper administration of justice. *Ex parte Gibson*, 811 S.W.2d 594, 596 (Tex.Crim.App.1991). High courts repeatedly caution judges against confusing offenses to the judge's personal sensibilities with obstruction to the administration of justice. *Id.*, quoting *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958). Offensive comments, even those spoken in open court, are not contumacious unless they are disruptive or boisterous. *Id.*; *Ex parte Curtis*, 568 S.W.2d 363 (Tex.Crim.App.1978); *Ex parte Pink*, 746 S.W.2d 758, 762 (Tex.Crim.App.1988).

 The evidence at the trial de novo in this case was conflicting as to the nature of Mr. Caress's confrontation with Judge Bell. We find that the preponderance of credible evidence shows Mr. Caress made an assertive statement in a normal tone of voice, neither loud nor threatening. Thus, we have some difficulty in determining that his statement would be contumacious under the case law cited above, even had it taken place in open court. Nevertheless, we were not present when Mr. Caress spoke his mind to Judge Bell and we believe that his words, if spoken in a manner both disruptive and boisterous, in the presence of the court while it was performing the business of administering justice, could properly be characterized as contumacious. We conclude, however, that applying these authorities, Mr. Caress's conduct could not constitute constructive contempt. Thus, as Mr. Caress could only have been guilty of direct contempt, and as all concerned agree that Judge Bell's actions were only justified in response to a direct contempt in any event, we next address the issues raised regarding that area of law.

### 2. Did Mr. Caress's conduct occur "in the presence of the court?"

 Direct contempt is that which occurs in the presence of the court. *Ex parte Knable*, 818 S.W.2d 811, 812 n. 2 (Tex.Crim. App.1991). The court of criminal appeals has observed that:

> '[I]n the presence of the court' does not necessarily mean 'in the immediate presence' of the judge of the court. The court is present whenever any of its constituent parts are engaged in the prosecution of the business of the court, which constituent parts include the judge, the court room, the jury, and the jury room. *Ex parte Aldridge* [169 Tex.Crim. 395], 334 S.W.2d 161, 165 (1960).

This is the law upon which Judge Bell relies in urging that holding Mr. Caress in contempt as she did was within the exercise of her discretion.[8] In direct contempt cases, the court must have direct knowledge of the facts which constitute contempt. *Daniels*, 722 S.W.2d at 709. This is essential because where the judge has personal knowledge of the contumacious acts, the court may, if need be, conduct a summary proceeding in which

---

8. *Aldridge*, despite this language, did not involve a finding of contempt without notice or hearing. The trial court there did not treat the contempt (which occurred in the doorway of the court and was not directly observed by the judge) as direct, but as constructive, and held a hearing before assessing any punishment. *Ex parte Aldridge*, 334 S.W.2d at 161.

the contemnor is not accorded notice nor a hearing. *Id.*

In those Texas cases we have found discussing the question of whether an act was "in the presence of the court," the court has been in session, and the formal procedures of administering justice have been going forward, but the act in question took place outside the immediate presence of the judge. *See Aldridge,* 334 S.W.2d at 165 (offending publication distributed to prospective jurors in capital murder case, in the room where they were waiting, causing mistrial and dismissal of empaneled jurors); *Daniels,* 722 S.W.2d at 710 (contemnor left courtroom peacefully under bailiff's escort, but physically attacked court master in doorway, causing general disturbance; that the judge was required to take evidence to ascertain exact nature of tumult not controlling); *Ex parte Arnold,* 503 S.W.2d 529, 532 (Tex.Crim.App. 1974) (not direct contempt to photograph undercover agent waiting in hallway).

■ Here, in contrast to those cases discussed above, we are faced with a variation on the application of direct contempt law: may an act be "in the presence of the court" when it is in the immediate presence of the person of the judge, but court is not in session? [9] We conclude that, under these circumstances, it cannot. We are guided toward this conclusion by the case of *Cooke v. United States,* 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925). There, attorney Clay Cooke was adjudged guilty of contempt after writing a letter to a federal district judge presiding in his client's civil case. The letter, signed by Cooke, asked the judge to recuse himself, saying that "I had believed that your Honor was big enough and broad enough to overcome the personal prejudice against the

defendant Walker, which I knew to exist, but I find that in this fond hope I was mistaken...." *Cooke,* 267 U.S. at 520, 45 S.Ct. at 391, 69 L.Ed. at 768. The judge allowed eleven days to elapse and then ordered the marshal to arrest Cooke and his client and brought them before the court, where he had appointed counsel to act "as a friend of the court," and had requested the district attorney to attend as well. *Id.* at 521–22, 45 S.Ct. at 391, 69 L.Ed. at 769. The judge then refused Cooke's request that he be allowed to summon witnesses and counsel on his behalf. He also refused to allow Cooke to make any statement as to his motives or beliefs in writing the letter. He found Cooke in contempt and assessed punishment at 30 days imprisonment. *Id.* at 527, 45 S.Ct. at 393, 69 L.Ed. at 771.

The Supreme Court found that, although the letter was contumacious as it was "calculated to stir the judge's resentment and anger," that nevertheless the judge had erred in "treat[ing] the case as if the objectionable words had been uttered against him in open court." *Id.* at 534, 45 S.Ct. at 394, 69 L.Ed. at 773. In distinguishing the situation from direct contempt, the court wrote:

> To preserve order in the courtroom for the proper conduct of business, the court must act instantly to suppress disturbance or violence or physical obstruction or disrespect to the court, *when occurring in open court....* *Id.* [Emphasis added].

> We think the distinction [between direct and constructive contempt] finds its reason, not any more in the ability of the judge to see and hear what happens in the open court than in the danger that, unless such an open threat to the orderly procedure of the court and such a flagrant defi-

9. We note here that Justice Clinton apparently thought that whether court was in session was an important issue in *Daniels,* although his dissent does not turn on that point. He quotes extensively from the statement of facts, which ends with the notations:

(Mrs. Daniels took a picture of the Judge) (Recess).

Justice Clinton then notes:

The last parenthetical note of the court reporter is so ambiguous that one cannot tell whether the court or the case was "recessed." *If the court had recessed just after applicant had taken*

*a picture of the judge, it was not engaged in business when the "second disturbance" occurred....* Most likely the reporter was indicating a recess of the case rather than the court. *Daniels,* 722 S.W.2d at 713 n. 3 [emphasis added].

We infer from this observation that had the court *not* been proceeding with its business, Mrs. Daniels' disturbance could not have constituted direct contempt, even had it taken place in the door of the courtroom and in the presence of the judge.

ance of the person and presence of the judge before the public in the 'very hallowed place of justice,' as Blackstone has it, is not instantly suppressed and punished, demoralization of the court's authority will follow.... *When the contempt is not in open court, however, there is no such right or reason in dispensing with the necessity of charges and the opportunity of the accused to present his defense by witness and argument. Id.,* 267 U.S. at 536, 45 S.Ct. at 394–95, 69 L.Ed. at 773–74 [emphasis added].

 We observe that the lack of due process in cases of direct contempt requires that the contemnor receive some sort of notice that it is *the court* he or she addresses, not just the person of the *judge.* Criticism that would clearly constitute contempt if undertaken in open court may appropriately, or at least not contumaciously, be contained in a newspaper editorial, a private conversation, or a letter. *See, e.g., Wood v. Georgia,* 370 U.S. 375, 395, 82 S.Ct. 1364, 1375, 8 L.Ed.2d 569, 583 (1962) (news release); *Ex parte Gibson,* 811 S.W.2d 594 (Tex.Crim.App.1991) (letter); *Ex parte Soape,* 171 Tex.Crim. 251, 347 S.W.2d 621 (1961) (conversation). Here, when he complained of her tardy appearance for the 12:30 p.m. docket, there was nothing to indicate to Mr. Caress that he was addressing the court, rather than the individual Betty Brock Bell. She was not wearing robes, she was not on the bench, and no one had called the court to order. The judge was in the hallway, not the courtroom or chambers. She was not talking to attorneys or litigants. If she had been engaging in court business, it was only because she had been called into the jury room by lawyers who had been awaiting her presence for over an hour. If Mr. Caress had voiced his criticisms to Judge Bell in open court, while she was robed, on the bench and hearing cases, we would have less trouble upholding the propriety of her decision to summarily hold him in contempt. If he had burst into the jury room while the judge and lawyers discussed motions, we would likewise be more easily persuaded that the judge had acted within her discretion. We believe there are two key distinctions in both hypothetical situations: first, Mr. Caress would have been on notice

that it was *the court* he berated, not the judge; second, his conduct would have clearly impeded the court in its business of administering justice. Neither fact is present in the situation before us, however. We hold that Mr. Caress was not in direct contempt because his acts were neither in the presence of the court, nor did they impede the administration of justice. Moreover, we hold that for an individual to be in direct contempt for criticizing a judge, he or she must have some sort of notice that the judge is acting as the court, and that to allow the criticism to proceed unchecked would result in an demoralization of the court's authority. *Cooke,* 267 U.S. at 536, 45 S.Ct. at 395, 69 L.Ed. at 773. Otherwise, our law requires those essentials of due process, notice and hearing. We therefore conclude that Judge Bell was not justified in holding Mr. Caress in direct contempt of court.

### 3. Was Mr. Caress entitled to a hearing even if his conduct constituted direct contempt?

 Further, even where a finding of direct contempt is justified, that does not automatically warrant summary punishment of the contemnor without notice and hearing. The Court of Criminal Appeals, citing the United States Supreme Court, has held as much, saying:

> Punishment without issue or trial is so contrary to the usual and ordinary indispensable hearing before judgment, constituting due process, that the assumption that the court saw everything that went on in open court is required to justify the exception; *but the need for immediate penal vindication of the dignity of the court created [the exception.] Knable,* 818 S.W.2d at 812, quoting *Taylor v. Hayes,* 418 U.S. 488, 497 n. 6, 94 S.Ct. 2697, 2703 n. 6, 41 L.Ed.2d 897, 907 n. 6 (1974) [emphasis in *Knable* ].

Summary punishment for direct contempt is justified only when the contempt is committed in the presence of the court *and* there is an exigent situation; that is, one which requires the judge to act immediately to quell disruption, violence, disrespect, or physical abuse. *Knable,* 818 S.W.2d at 813 n. 4.

Thus, even were we to find that a direct contempt had been committed, once the immediate disturbance had dissipated and a hearing *could* have been held, due process mandates that it *should* have been held. *Id.* at 813–14. We conclude that Judge Bell's refusal to hold a hearing later in the afternoon of November 15, despite a direct request from Mr. Caress's counsel, was not justified.

### 4. Did Judge Bell misstate the factual basis for her judgment and commitment for direct contempt?

As is made clear by the preceding discussion, to be punishable as direct contempt, the law requires that Mr. Caress's conduct must have taken place in open court, or at least while the court was actively pursuing the business of dispensing justice in its immediate environs. The judgment and commitment for direct contempt entered by Judge Bell so reflects, stating *"in open court* and in the presence of the judge thereof, and while said court was engaged in its regular business, hearing and determining causes pending before it, one BRUCE STEVEN CARESS was guilty of contemptuous behavior." As we have discussed, it is absolutely necessary that these circumstances be reflected to justify a finding of direct contempt. We conclude that the only explanation for this misstatement is that Judge Bell reflected the facts to fit the punishment she wished to impose, and that what actually occurred was not correctly portrayed in her judgment. We are led to the further conclusion that Judge Bell allowed her personal reaction to Mr. Caress's statements to dictate her judicial acts in summarily holding him in contempt. This is not an indulgence the law allows our judiciary. *Gibson,* 811 S.W.2d at 596. We find Judge Bell's misstatement in her judgment of contempt was a violation of the mandate that a judge shall comply with the law and act in a manner that promotes the public's confidence in the integrity and impartiality of the judiciary.

### 5. Were the judge's acts "wilful?"

In determining whether Judge Bell's acts are subject to discipline, they must constitute a "wilful violation of . . . the Code of Judicial Conduct." TEX.GOV'T CODE ANN. § 33.001(b)(2). "Wilful" conduct is the intentional or grossly indifferent misuse of judicial office, involving more than an error of judgment or lack of diligence. *In re Thoma,* 873 S.W.2d at 489. "Wilful" conduct requires a showing of bad faith, including a specific intent to use the powers of office to accomplish an end which the judge knew or should have known was beyond the legitimate exercise of authority. *Id.*

Here, several aspects of Judge Bell's conduct support a finding of wilful conduct. First, as we have discussed, Judge Bell's judgment and commitment for direct contempt affirmatively states that Mr. Caress's conduct occurred "in open court and . . . while said court was engaged in its regular business, hearing and determining causes pending before it. . . ." Mr. Caress's statements did not occur in open court, nor while the court was engaged in its regular business of hearing and determining cases. This misstatement of where and how the incident occurred goes to the very core of this case: the propriety of Judge Bell's actions are determined in large part by whether the confrontation with Mr. Caress occurred in the presence of the court, while it was in session, and whether immediate action was necessary to halt an exigent situation impeding the administration of justice.

Second, when Mr. Caress's counsel approached Judge Bell and suggested that she read the cases he had found on direct contempt, she refused to do so, telling him, "I may be wrong in the law, but he was disrespectful to me, and he will be going to jail." She also refused to hold any evidentiary hearing, despite Smith's request, and despite the law's requirement that a hearing be held once the immediate disturbance has dissipated. This stubborn refusal to listen to the contemnor's arguments indicates a gross indifference to the applicable law.

Third, almost two months after the confrontation with Mr. Caress, Judge Bell issued a second order for his arrest and commitment for direct contempt, without hearing, despite a higher court's directive that "Judge Bell or another to conduct further hearing

after release if so ordered." Even where a direct contempt has unquestionably occurred, once the exigency of keeping order in the courtroom dissipated, so too did the court's power to punish contemptuous conduct without notice or hearing. *Knable*, 818 S.W.2d at 811. Judge Bell's issuance of another summary order of commitment, after a specific directive by another court to hold a hearing, and after two months in which to research the law and engage in cool reflection, was in this Court's opinion a wilful misuse of judicial power. Thus, we find that the commission has established by a preponderance of the evidence that Judge Bell wilfully violated the Code of Judicial Conduct.

### *CONCLUSION*

 It is this Court's conclusion that Justice of the Peace Betty Brock Bell wilfully violated Texas Code of Judicial Conduct Canon 2A by stating in her original judgment and commitment for direct contempt that her court was in session, engaged in its regular business of hearing and determining causes before it, when Mr. Caress approached and confronted her about her late return from lunch, when the confrontation actually occurred in the hallway when court was not in session. It is this Court's further conclusion that Justice of the Peace Betty Brock Bell wilfully violated Texas Code of Judicial Conduct Canons 3B(2) and 3B(4) of the Texas Judicial Conduct Code by responding to a personal criticism, voiced outside the courtroom when court was not in session and when she was not immediately engaged in furthering the court's business, with a finding of direct contempt. We also conclude that Judge Bell did not wilfully violate any Canon by customarily failing to be personally present for the calling of her docket.

Finally, we conclude that the sanction imposed by the State Commission on Judicial Conduct was appropriate. We therefore affirm the commission's order of public admonition to Judge Bell as to those violations we have found she committed. We dismiss the order of public admonition as to the remaining charge.

JONES, Justice, concurring.

In this proceeding, the State Commission on Judicial Conduct has charged Justice of the Peace Betty Brock Bell with violating the *Code of Judicial Conduct* by three actions: (1) "customarily not being personally present to commence court with the calling of the docket"; (2) "responding to a personal criticism, voiced outside the courtroom and when court was not in session, with a finding of direct contempt of court, jail sentence, and fine"; and (3) "stat[ing], in her original Judgment and Commitment for Direct Contempt, that Court was in session, engaged in its regular business of hearing and determining causes pending before it, when in fact the confrontation occurred in a hallway and court was not in session." The majority acquit Judge Bell of the first charge and convict her of the last two. I write separately because I would acquit Judge Bell of the second charge as well as the first. Because I agree with the majority's conclusion as to the third charge, however, I concur in the result.

The majority find that Mr. Caress "made an assertive statement in a normal tone of voice, neither loud nor threatening." Nonetheless, because the evidence describing the exact nature of the confrontation between Mr. Caress and Judge Bell was conflicting, the majority assume that Mr. Caress's actions could properly be characterized as contemptuous if they had taken place in the courtroom while court was in session. I agree with this characterization of Mr. Caress's actions, especially in light of the fact that the only truly disinterested witness to recount the confrontation, attorney Ronald Mock, described Mr. Caress as "belligerent" and as "shouting" at Judge Bell. Indeed, even Mr. Caress himself testified that "to some degree" he was "angry" and "speaking in a loud manner." Accordingly, I think it is appropriate that we assume that Mr. Caress's words and actions were of a contemptuous nature.

The majority conclude, however, that because the confrontation took place in the hallway between the courtroom and the jury room rather than in the courtroom itself, and because court had not been formally announced into session, Judge Bell violated the

Code of Judicial Conduct by failing to conduct a hearing before holding Mr. Caress in contempt. It is with this conclusion that I disagree.

The majority opinion contains an extensive discussion of the law of direct and constructive (or "indirect") contempt, and I agree with much of it. Our task in this proceeding, however, is not to determine if Judge Bell lacked authority to hold Mr. Caress in contempt without a hearing, but to determine if Judge Bell violated the Code of Judicial Conduct. Based on the standard set forth in the majority opinion, with which I also agree, that determination entails deciding if Judge Bell acted "wilfully" and "in bad faith." In the present context, that decision necessarily turns on whether the law of direct and constructive contempt is sufficiently clear that Judge Bell *must have known* that she lacked power to hold Mr. Caress in contempt without a hearing or must have exhibited *gross indifference* to whether she had such power or not.

The problem is that the law of direct and constructive contempt is anything but clear. An expert in the area of contempt law, Mr. Charles Fiscus, testified that the aspect of contempt law at issue in this case was "somewhat confused." My own research confirms that assessment as accurate, if not an understatement. The most cogent and lucid analysis of this area of contempt law I have found is contained in Wendell A. Odom & Lang A. Baker, *Direct and Constructive Contempt, An Attempt to Clarify the Confused History of a Confused Distinction in the Jurisprudence of Texas,* 26 Baylor L.Rev. 147 (1974). Judge Odom and Mr. Baker emphasize that there are two separate distinctions within the law of contempt: (1) direct contempt vs. constructive contempt; and (2) contempt for which notice and hearing are required vs. contempt for which notice and hearing are not required. A large part of the confusion, both in Texas and elsewhere, stems from the tendency of courts and commentators to improperly identify the direct/constructive distinction with the procedural distinction, i.e., to improperly conclude that direct contempt is synonymous with contempt for which a prior hearing is *not* required, and that con-

structive contempt is synonymous with contempt for which a prior hearing *is* required. In fact, the two distinctions do not coincide.

The authors approve the following distinction between direct contempt and constructive contempt:

> [A] direct contempt rests upon the fact that the offending conduct is a direct affront to the authority, justice or dignity of the court, and is contemptuous independently of the existence of any order or decree of the offended court. In contrast, constructive contempt is only constructively contemptuous: *but for* the order or decree violated, the allegedly contemptuous conduct would not constitute contempt.

Odom & Baker, *supra* at 150. The authors approve the following distinction between contempt that requires a hearing and contempt that does not require a hearing:

> Where the contempt is committed directly under the eye or within the view of the court, it may proceed "upon its own knowledge of the facts, and punish the offender, without further proof and without issue or trial in any form," *Ex parte Terry,* [128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405 (1888),] whereas, in cases of misbehavior of which the judge cannot have such personal knowledge, and is informed thereof only by the confession of the party, or by the testimony under oath of others, the proper practice is, by rule or other process, to require the offender to appear and show cause why he should not be punished.

Odom & Baker, *supra* at 154 (quoting from *Ex parte Savin,* 131 U.S. 267, 277, 9 S.Ct. 699, 702, 33 L.Ed. 150 (1889)).

Obviously, not every affront to a judge or other court officer ought to invoke the court's contempt power. To describe conduct that was sufficiently "direct" to constitute an affront to the authority, justice, or dignity of "the court" rather than to the person of the judge, courts and commentators have chosen an unfortunate phrase: "in the presence of the court." Thus, the usual definition of direct contempt requires that if the offending conduct did not violate a prior court order, it had to be committed "in the presence of the court." This phrase, however, describing what is required for conduct to constitute

direct contempt, is confusingly close to the phrase used *in the procedural distinction* to describe the circumstances under which a judge may issue a contempt order without a prior hearing. It is little wonder that the direct/constructive distinction and the procedural distinction have so often been improperly linked by courts and commentators alike. *See, e.g., Ex parte Ratliff,* 117 Tex. 325, 3 S.W.2d 406, 406 (1928) ("In the one [direct contempt] the court sees and knows all the acts which constitute the contempt, and needs no testimony to establish their existence, as facts, while in the other [constructive contempt], testimony must be heard to inform the court, and this being so, due process of law demands that this testimony should be heard publicly ... after due notice to the accused"); *Ex parte Arnold,* 503 S.W.2d 529, 531 (Tex.Crim.App.1974) (adopting the foregoing quote from *Ex parte Ratliff*); *Ex parte Daniels,* 722 S.W.2d 707, 709 (Tex.Crim.App.1987) ("Direct contempt is contempt which is committed or occurs in the presence of the court. In direct contempt cases the court has direct knowledge of the facts which constitute contempt. Constructive or indirect contempt involves actions outside of the presence of the court. Constructive contempt refers to acts which require testimony or the production of evidence to establish their existence."); James M. Magee, *Contempt of Court in Texas,* 14 S.Tex. L.J. 278, 280 (1973) ("Direct contempts are punishable summarily. No notice or hearing are required. The courts justify summary punishment based on their need to have the power to preserve decorum in the courtroom *and* the lack of factual dispute because the act occurred before the court."); Stewart Rapalje, *Treatise on Contempt* 26 (1884) ("Direct contempts may be summarily punished by order of the presiding judge, after such a hearing as he may deem just and necessary; but constructive contempts, though equally punishable, yet require a different and less summary process.").

Despite the blurred distinction, the issue of whether offending conduct occurred "within the presence of the court" is different from the issue of whether the conduct occurred "within the immediate view of the judge" (so as to eliminate the need for a hearing to determine the facts). Indeed, whether offending conduct occurred "within the presence of the court" is arguably not even the factor that distinguishes direct contempt from constructive contempt. Rather, it is the factor by which courts determine if offending conduct that is not a violation of a prior court order (i.e., that is not constructive contempt) should be punishable by contempt at all. Thus, the scope of "within the presence of the court" takes on significant public-policy ramifications. In determining its scope, courts have recognized that "within the presence of the court" is not confined to the actual courtroom. *See, e.g., Ex parte Aldridge,* 169 Tex.Crim. 395, 334 S.W.2d 161, 165 (1959) ("The wording 'in the presence of the court' does not necessarily mean 'in the immediate presence' of the judge of the court. The court is present whenever any of its constituent parts are engaged in the prosecution of the business of the court, which constituent parts include the judge, the court room, the jury, and the jury room."). Judge Odom and Mr. Baker approve the conclusion in Corpus Juris that " 'in the presence of the court' sufficient to constitute direct contempt, exists if the contempt is 'committed in any part of the place set apart for the use of its officers, jurors, and witnesses, including the hallways of the courthouse, the steps, or the courthouse yard.' " Odom & Baker, *supra* at 151–52 (quoting Corpus Juris, *Contempt,* § 40 (1917)).

I agree with the scope of "in the presence of the court" described by Judge Odom and Mr. Baker. Accordingly, I disagree with the majority that a judge necessarily loses the mantle of "the court" the instant he or she steps off the bench. I believe a strong argument can be made that the judge should retain that character at least within the immediate vicinity of the courtroom. For example, contumacious conduct occurring in a hallway outside the courtroom can be just as disruptive to the administration of justice and just as much a threat to the court's authority, justice, and dignity as conduct occurring inside the courtroom. *Cf. Ex parte Daniels,* 722 S.W.2d 707, 710 (Tex.Crim.App. 1987) (disturbance partially in hallway outside courtroom door was direct contempt).

One thing is clear: in contempt law there is much room for disagreement about both the direct/constructive distinction and the procedural distinction.

Attempting to apply the confused state of the law of contempt to the present case, the fact that the entire incident occurred "within the immediate view of the judge" would seem to obviate the need for a hearing before contempt could be used. Moreover, I believe a strong argument exists that Mr. Caress's actions did constitute direct contempt. However, we need not make these decisions. Our task is not to decide whether Judge Bell made an error of law, but to decide whether she violated the Code of Judicial Conduct. As the majority notes, this effectively requires a finding that Judge Bell knew her use of contempt power was beyond the legitimate exercise of her authority. In an area of the law as confused as this one is, and in a case as close as this one is, I cannot say the Commission met its burden of showing that Judge Bell acted wilfully and in bad faith as to the second charge against her.

The majority cite two grounds for concluding that Judge Bell acted wilfully and in bad faith in holding Mr. Caress in contempt without a hearing.[1] First, they point to Judge Bell's statement ("I may be wrong on the law, but he was disrespectful to me and he will be going to jail") made later the same day to Mr. Caress's attorney, David Smith, and to her failure to read the cases he had photocopied for her. This is a weak reed. If every judge who declined to read a lawyer's cases or made a statement to the effect that, "I may be wrong on the law, but ..."[2] was guilty of a wilful and bad-faith violation of the Code of Judicial Conduct, there would be precious few judges in the state left untainted. In my opinion, these actions by Judge Bell are virtually no evidence that she either *knew* she was wrong or *did not care*. More than a scintilla? Perhaps. Persuasive? Hardly.

Second, the majority point to the fact that Judge Bell later issued her "Alias Commitment for Direct Contempt" (1) in the face of a "directive," contained in the November 15 order of the county court at law that set aside Judge Bell's original order and released Mr. Caress, which stated, "Judge Bell or another to conduct further hearing after release if so ordered"; and (2) after sufficient time had passed for cool reflection and legal research. As to the first of these, the order of the county court at law was withdrawn on November 24, just nine days after it was issued. Necessarily, the hand-written, ambiguous "directive" was withdrawn along with it. At the time Judge Bell issued the "Alias Commitment for Direct Contempt" in January, therefore, she had no reason whatsoever to view that directive as an obstacle to the reincarceration of Mr. Caress. As to the second of the stated grounds, the passage of time can indeed be significant in circumstances where a material length of time intervenes between the offending conduct and the order of contempt. *See Ex parte Knable,* 818 S.W.2d 811, 812–13 (Tex.Crim.App.1991). In the present case, however, Judge Bell's "Alias Commitment for Direct Contempt" was not a contempt order at all, but merely an order directing the Sheriff of Harris County to arrest Mr. Caress in order to *satisfy the original contempt order,* which had been effectively reinstated by the withdrawal of the November 15 order of the county court at law. Thus, the grounds cited by the majority provide scant support for their finding of wilfulness and bad faith as to the Commission's second charge.

I am fearful that, as a practical matter, the message trial-court judges and justices of the peace throughout this state may receive from the majority's holding is that if they make a legal mistake in using their contempt power, they may be subject to sanctions for violating the Code of Judicial Conduct. This could have a profound chilling effect on the long-recognized authority of such judges to use

1. The majority also cite a third basis for their finding of wilfulness and bad faith, but it is relevant only to the third and final charge against Judge Bell—that her original order of contempt affirmatively misstated the factual context of the offending conduct.

2. There are any number of variations on this I-may-be-wrong theme. My personal favorite is, "The court of appeals may reverse me, but...."

contempt. It is certainly true that a judge's power to use contempt should be used cautiously. But if, in an effort to *force* trial judges to use that power cautiously, we put too many constraints on it, we risk destroying its effectiveness. It has long been recognized that, to be effective, the contempt power must be broad. *See Ex parte Daniels,* 722 S.W.2d at 709 ("Contempt power is a necessary and integral component of judicial authority.... While it is clear the exercise of this authority should be tempered with common sense and sound discretion, contempt power is accorded wide latitude because it is essential to judicial independence and authority."). In the occasional case where contempt is used inappropriately, habeas corpus relief is available to prevent irreparable harm to contemnors. Disciplinary sanctions against the judge, however, should be reserved for only gross abuses of the contempt power. I do not believe the instant case presents such circumstances.

I would acquit Judge Bell of the Commission's second charge.