In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00066-CV


______________________________




IN THE MATTER OF THE MARRIAGE


OF SAMUEL DWAIN BORN AND


DONNA SUE BAILEY BORN





 


On Appeal from the County Court at Law


 Panola County, Texas


Trial Court No. 2007-185




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Chief Justice Morriss



MEMORANDUM OPINION


 Samuel Dwain Born (Sam) and Donna Sue Bailey Born were divorced (1) after a marriage of
a little over six years. (2) During the bench trial regarding the divorce, three disputed accounts took
much of the focus. Sam had brought into the marriage the funds that had been in each of these three
accounts at the time of the marriage, yet income earned on each account during the marriage was
reinvested into the account and commingled with the funds then on hand. Sam attempted to trace
his pre-marriage separate property into the funds on hand in each of the disputed accounts at the time
of the divorce. In the effort, Sam provided oral testimony as to each of the accounts--testimony that
could have been disbelieved by the trial court--and tendered as exhibits only some, not all, of the
account records on each account. Some of those records projected values or balances at a future
date, "assuming no other activity." In the end, none of the three accounts enjoyed a full accounting
of all transactions occurring or all income accruing during the marriage. 

 Two other facts are relevant to issues urged on appeal. Sam admitted to not having filed
federal income tax returns on his income during the marriage (Donna did, on her income). Sam also
wanted the trial court to find Donna in contempt for certain post-estrangement actions he alleged she
had taken.

 Contrary to Sam's desires, the trial court classified as community property each of the three
disputed accounts, dividing one of them equally and the other two, sixty-five percent to Sam and
thirty-five percent to Donna. Also to Sam's disappointment, the trial court ruled that Sam was
responsible for his own income tax liabilities and failed to find Donna in contempt of court. Sam
appeals.

 We affirm, finding that (1) classifying the three accounts as community property and dividing
them  as  was  done  was  not  error,  (2)  assigning  to  Sam  his  own  tax  liabilities  was  not  error,
and (3) failing to find Donna in contempt was not error.

(1) Classifying the Three Accounts as Community Property and Dividing Them as Was Done
Was Not Error


 In multiple points of error, Sam complains of the trial court's finding that two mutual fund
accounts and a bank certificate of deposit were community property and also complains of the trial
court's division of those assets. Because these points of error involve a common analysis, we discuss
them together.

 Before Donna and Sam married, Sam owned two mutual fund accounts (the "First Command
Accounts"): one, a Roth IRA identified with the last few digits of its account number as 5556-6 or
5556 (the "Roth IRA"), and the other First Command account identified with the last few digits of
its account number as 8653-7 or 8653 ("Account 8653"). The third disputed account is a certificate
of deposit ("CD") issued by Panola National Bank ("CD 7124"). At trial, Sam offered certain
documentary evidence about the three accounts, which confirmed that he had owned them before
marriage but which did not detail all possible transactions or all income earned on, and reinvested
in, the accounts during the marriage.

 The trial court, after classifying all three disputed accounts as community property, split the
CD equally between Sam and Donna and awarded sixty-five percent of the First Command Accounts
to Sam, leaving thirty-five percent for Donna.

 Donna supports the trial court's action by arguing that, because Sam could not identify all of
the community property interests in the three accounts because he did not provide statements from
each year of the marriage, the community interests, i.e., the reinvested dividends, fatally commingled
with the separate property interests, rendering the three accounts community property. We agree
with the trial court and with Donna.

 Any property on hand in a marriage is presumed to be community property. Tex. Fam. Code
Ann. § 3.003(a) (Vernon 2006). To rebut this presumption, the person seeking to prove the separate
character  of  the  property  must  do  so  by  clear  and  convincing  evidence.  Tex.  Fam.  Code
Ann. § 3.003(b) (Vernon 2006).

 "Clear and convincing" evidence means the measure or degree of proof that will produce in
the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be
established. In re C.H., 89 S.W.3d 17, 25 (Tex. 2002); Mock v. Mock, 216 S.W.3d 370, 372 (Tex.
App.--Eastland 2006, no pet.). 

 A party seeking to rebut the community presumption must trace the assets on hand during
the marriage back to property that is separate in character. Cockerham v. Cockerham, 527 S.W.2d
162, 167 (Tex. 1975); Boyd v. Boyd, 131 S.W.3d 605, 612 (Tex. App.--Fort Worth 2004, no pet.). 
Tracing involves establishing the separate origin of the property through evidence showing the time
and means by which the spouse originally obtained possession of the property. Boyd, 131 S.W.3d
at 612. The burden of tracing is a difficult, but not impossible, burden to sustain. Latham v. Allison,
560 S.W.2d 481, 484 (Tex. Civ. App.--Fort Worth 1977, writ ref'd n.r.e.). We are to resolve any
doubt as to the character of property in favor of the community estate. Akin v. Akin, 649 S.W.2d 700,
703 (Tex. App.--Fort Worth 1983, writ ref'd n.r.e.); Contreras v. Contreras, 590 S.W.2d 218, 221
(Tex. App.--Tyler 1979, no writ).

 "When . . . cash dividends are passed on to married owners of mutual fund shares who hold
them as separate property, there is no question that these dividends become community property of
the spouses." Bakken v. Bakken, 503 S.W.2d 315, 317 (Tex. Civ. App.--Dallas 1973, no writ). The
mere proof that property was separate property when purchased does not discharge this burden where
community property has become so commingled with the original separate property as to defy
resegregation and identification. Tarver v. Tarver, 394 S.W.2d 780, 783 (Tex. 1965); Martin v.
Martin, 759 S.W.2d 463, 466 (Tex. App.--Houston [1st Dist.] 1988, no writ). If separate property
and community property have been so commingled as to defy resegregation and identification, the
statutory presumption of community property prevails; when separate property has not been
commingled or its identity as such can be traced, the statutory presumption is dispelled. In re Estate
of Hanau, 730 S.W.2d 663, 667 (Tex. 1987); Tarver, 394 S.W.2d at 783.

 Courts have no difficulty in following separate funds through bank accounts. Sibley v. Sibley,
286 S.W.2d 657, 659 (Tex. Civ. App.--Dallas 1955, writ dism'd). A showing of community and
separate funds existing in the same account does not divest the separate funds of their identity and
establish the entire amount as community, if the separate funds may be traced and the trial court is
able to determine accurately the interest of each party. Holloway v. Holloway, 671 S.W.2d 51, 60
(Tex. App.--Dallas 1983, writ dism'd).

 Here, of course, the trial court found that each account was community property, in other
words, that Sam failed to trace, by clear and convincing evidence, his separate property into the
balances in the accounts at the time of divorce.

 Sam and Donna both suggest in their briefing to this Court that, in reviewing the trial court's
division of properties, we should determine whether the trial court abused its discretion. (3) In dividing
assets, a trial court abuses its discretion if it acts "without reference to any guiding rules or
principles" or is "arbitrary or unreasonable." Boyd, 131 S.W.3d at 611; see Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985); McClary v. Thompson, 65 S.W.3d 829, 833
(Tex. App.--Fort Worth 2002, pet. denied). We should indulge every reasonable presumption in
favor of a proper exercise of discretion. Boyd, 605 S.W.2d at 611; Pletcher v. Goetz, 9 S.W.3d 442,
446 (Tex. App.--Fort Worth 1999, pet. denied) (op. on reh'g). We will reverse only if the trial court
clearly abused its discretion and the error materially impaired a just and right division. Jacobs v.
Jacobs, 687 S.W.2d 731, 732-33 (Tex. 1985); Boyd, 605 S.W.2d at 611.

 All three accounts began as Sam's separate property, via the inception-of-title rule. See Tex.
Fam. Code Ann. § 3.001(1) (Vernon 2006); Barnett v. Barnett, 67 S.W.3d 107, 111 (Tex. 2001). 
But, these assets all generated income that was reinvested into the respective accounts. What was
to be divided, therefore, was the balance on hand in each of these three accounts at the time of the
divorce; and those balances included, at least, principal and reinvested income paid during the
marriage. 

 Income earned during marriage is community property. Bakken, 503 S.W.2d at 317. Because
community property income had been commingled with the originally separate principal, Sam was
obligated to trace, by clear and convincing evidence, each account and its holdings from the date of
divorce back to the date of the marriage. See Cockerham, 527 S.W.2d at 167.

 a. The Roth IRA

 To try to trace separate property in the Roth IRA, the largest of the three accounts, Sam
produced year-end statements for 2000, 2002, 2003, 2005, and 2006. The statement for 2000
establishes that, a little over three months before the marriage, the account was in Sam's name and
had a balance of 3,622.713 shares having a total value of $44,088.42. The account statements show
four entries during the marriage reflecting the reinvestment into the account of "income":

 2002 $255.95

 2003 $228.45

 2005 $373.86

 2006 $427.62

These statements also show two entries during the marriage where "capital gains" distributions (4) were
reinvested:

 2005 $580.19

 2006 $1,158.94

Sam testified that the amount of dividend reinvestment for 2007 would not be known until the year-end statement. 

 What cannot be determined from the documentary evidence submitted as to the Roth IRA
is what transactions, (5) if any, occurred between December 31, 2000, and April 7, 2001 (the date of
the marriage); between April 7, 2001, and December 31, 2001; between December 31, 2003, and
December 31, 2004; or between December 31, 2006, and July 20, 2007 (the date of the divorce). 
In those documentary gaps, various deposits, withdrawals, or both could have occurred.

 b. Account 8653

 For Account 8653, Sam produced a statement dated January 19, 2001, which showed
1,009.76 shares owned; this statement does not show price per share. A statement dated March 12,
2001, shows 279.833 shares owned, at $10.96 per share. Sam also produced statements showing the
following "income" reinvestments:

 2002 $8.67

 2003 $5.84

 2006 $23.58

 Also shown by the documentation were the following reinvestments from "capital gain"
distributions:

 2006 $116.41 (a "short term capital gain distribution" reinvestment)

 2006 $107.68 (a "capital gain distribution" reinvestment)

 What cannot be determined from the documentary evidence submitted as to Account 8653
is what deposits or withdrawals, if any, occurred between March 12, 2001, and April 7, 2001 (the
date of the marriage); between April 7, 2001, and December 31, 2001; between December 12, 2003,
and December 31, 2005; or between December 31, 2006, and July 20, 2007 (the date of the divorce).



 c. CD 7124

 As to CD 7124, Sam produced statements covering the beginning of the marriage and near
the date of the divorce, but left an approximately four-and-one-half year gap between those
statements. Sam testified, and the documentary evidence supports his claim, that he bought CD 7124
in 1999, well before the marriage, for $8,000.00. He did not, however, know the value of the CD
on the date of the marriage, April 7, 2001. He also did not know how much interest had been earned
on the CD in 2001, 2002, 2003, 2004, 2005, or 2006. 

 The documentary evidence on the CD shows that the balance decreased, a decrease that could
be consistent with Sam's claimed withdrawal of $2,500.00. But the undocumented gap as to this CD
is large, approximately four and one-half years out of the some six-year marriage.

 The documentation states that there were no deposits (other than interest) since the CD was
originally purchased in 1999. Therefore, the evidence demonstrates that the only property placed
into the account, beyond the original separate-property principal, was the interest earned on the
account. But we cannot know how much interest there was. Had the documentation also stated that
there had been no withdrawals, we could easily allocate between separate-property principal and
community-property interest. But the documentation does not say that there were no withdrawals
and does not state what the interest rate was during the gap in documentation. While common sense
suggests that the interest rate on a two-year, bank CD did not likely go much higher than the 4.4
percent or 5.8 percent shown by the documentation in evidence, there is no proof of what that
interest rate was during the gaps. Thus, it is impossible to accurately trace the separate property
portion of the CD balance as of the date of the divorce. 

 An older Texas Supreme Court case is instructive. In that case, the trial court had ruled that
two savings certificates were community property. The Texas Supreme Court reversed as to one
certificate, which it found had been clearly traced to separate property, and affirmed as to the other,
which it found had not been so traced. The traced certificate had clearly been bought with the money
withdrawn from the husband's separate-property account, and all deposits in that case were clearly
marked "dividends" and were all accounted for. McKinley v. McKinley, 496 S.W.2d 540 (Tex.
1973). The second McKinley certificate, though, was much more difficult, if not impossible, to
trace, due to gaps in the documentation. Thus, the high court ruled that it had been correctly deemed
community property. Id. at 542.

 Generally, conclusory or uncorroborated testimony that funds are separate property is
insufficient to rebut the community presumption, unless there is also evidence that traces the funds. 
Mock, 216 S.W.3d at 373. Compare Boyd, 131 S.W.3d at 612 (husband failed to present specific
tracing testimony or corroborating testimony or evidence of nature of real and personal property);
Ganesan v. Vallabhaneni, 96 S.W.3d 345, 354 (Tex. App.--Austin 2002, pet. denied) (husband's
testimony failed to establish certain accounts were separate property because his testimony and
exhibits failed to "provide account numbers, statements of accounts, dates of transfers, amounts
transferred in or out, sources of funds or any semblance of asset tracing"); Osorno v. Osorno, 76
S.W.3d 509, 512 (Tex. App.--Houston [14th Dist.] 2002, no pet.) (husband's testimony insufficient 
to overcome community presumption in absence of deposit slips or bank records tracing source of
funds); Bahr v. Kohr, 980 S.W.2d 723, 728-29 (Tex. App.--San Antonio 1998, no pet.) (wife's
testimony failed to establish property was her separate property because documentary evidence
offered to support claim property was purchased with monies from separate-property account did not
show date account was opened, running balance of account, or identify party receiving wire transfer
for alleged purchase of property at issue); Robles v. Robles, 965 S.W.2d 605, 616 (Tex.
App.--Houston [1st Dist.] 1998, pet. denied) (husband's testimony insufficient to overcome
community presumption when husband testified only as to separate nature of property in dispute, but
provided no supporting documentary evidence to trace funds used to purchase property); with Faram
v. Gervitz-Faram, 895 S.W.2d 839, 843 (Tex. App.--Fort Worth 1995, no writ) (wife did establish
that two investment accounts and Treasury bill were her separate property through documents
"tracing the source of funds used to purchase the Treasury bill back to a USAA savings account
designated in the couple's pre-marital property agreement as Gervitz' separate property" and tracing
those accounts to before marriage); Newland v. Newland, 529 S.W.2d 105, 107-09 (Tex. Civ.
App.--Fort Worth 1975, writ dism'd) (husband did establish that funds in account were his separate
property because, for most of the twenty-year period involved, the husband's "testimony was
corroborated by bank records" and "documentary evidence").

 In a quite recent case, the husband offered testimony and documentary evidence to trace CDs
owned during the marriage from his separate property funds. The appellate court determined the
CDs were both separate and community property:

 [W]e conclude that the CDs . . . contained both separate funds (the amounts that
Mike had on deposit prior to his marriage to Cindy) and community funds (the
amount of interest earned by the accounts during Mike's and Cindy's marriage). The
pre-marriage bank statements established the beginning values of the CD's that were
Mike's separate property. By characterizing the entire accounts as community, when
the separate property amounts were in evidence, the trial court mischaracterized a
significant portion of the CDs as community property. Therefore, we find the court
erred in characterizing the CDs, in their entirety, as community property.

Perez v. Perez, No. 09-06-521CV, 2008 Tex. App. LEXIS 3668, at *7-8 (Tex. App.--Beaumont
May 22, 2008, pet. denied).

 In Zagorski v. Zagorski, 116 S.W.3d 309 (Tex. App.--Houston [14th Dist.] 2003, pet.
denied), the trial court found that the husband adequately traced more than two million dollars of
pre-marriage separate-property money which had been used during the marriage for expensive toys
and gifts for he and his wife, community living expenses, and investments and business deals. Id.
at 315-16, n.3. The wife complained he had not met the clear and convincing standard:

 The essence of her complaint is credibility. Specifically, she complains Tony's
inception of title evidence isn't believable due to incomplete documentation,
inconsistent documents and biased testimony. As evidence the Account was
separate, Tony submitted oral testimony and circumstantial documentary evidence.
His evidence traced the origin of funds in the Account to the repayment of savings
prior to their marriage. 

Id. at 316. The court held that, although the husband did not introduce more specific proof such as
wire transfers or trust or loan agreements, the trial court was the sole evaluator of credibility:

 The judge obviously resolved the disputed evidence in favor of his findings. In light
of our review of the entire record, we hold whether the trial judge could reasonably
conclude that the fact that Tony had accumulated personal savings of at least
$2,057,524.20 prior to the date of the parties' marriage was highly probable;
therefore, the evidence is factually sufficient. Because the trial court's conclusion of
law number 5 is correctly drawn from finding number 7, we hold conclusion 5 to be
correct as a matter of law.


Id. at 318.

 The wife went on to claim community property funds were hopelessly commingled with the
husband's separate-property interests. The appellate court likewise rejected this argument:

 the record does contain ample, clear evidence to permit segregation of the separate
and community funds in the Account and shows that any community funds were
depleted by community expenses. Tony introduced an exhibit showing less than
$115,000 in interest was earned during the marriage. Another exhibit shows
approximately $366,000 was withdrawn for marital living expenses. Lori cites no
evidence rebutting the community-out-first presumption.


Id. at 320.

 Here, the trial court was left to speculate, based on Sam's testimony and spotty records, what
part of the three accounts was the original separate-property principal and what part was community.
See Latham, 560 S.W.2d at 485 (conjecture concerning source of funds is insufficient to trace); see
also McKinley, 496 S.W.2d at 544 (community presumption prevails if speculation is required to
assess character of property).

 As to all three accounts, there is incomplete documentary, and less-than-compelling oral,
evidence tracing the account from its presumed status as community property, during the marriage,
to Sam's separate property, before the marriage. Sam failed to accurately segregate the separate and
community property interests.

 A party asserting separate ownership must, by clear and convincing evidence, trace the
original separate property into the particular assets on hand at the dissolution of marriage.
Cockerham, 527 S.W.2d at 167. In each case, Sam failed to convince the trial court that he had
adequately traced his separate property. Plenty of authority exists to support the trial court's finding. 
In light of the cases cited above, the record evidence does not compel a holding that the trial court
abused its discretion in characterizing the accounts.

 Once we have moved past the characterization of property as community or separate, we
review the trial court's division of marital property under an abuse of discretion standard. Murff v.
Murff, 615 S.W.2d 696, 698-99 (Tex. 1981); Stavinoha v. Stavinoha, 126 S.W.3d 604, 607-08 (Tex.
App.--Houston [14th Dist.] 2004, no pet.). We may reverse the trial court's division of marital
property only if, after reviewing the record, it is clear that the trial court's decision is an abuse of
discretion or is manifestly unjust and unfair. Stavinoha, 126 S.W.3d at 607-08; see also Sutton v.
Eddy, 828 S.W.2d 56, 58 (Tex. App.--San Antonio 1991, no writ) (record must affirmatively show
that trial court's decision is arbitrary and unreasonable). 

 Sam complains of the division, but he received half of one and almost two-thirds of the other
two contested accounts. We find no abuse of discretion.

(2) Assigning the Tax Liabilities to Sam Was Not Error

 Sam complains that the trial court ordered each party to pay taxes on income earned by that
party. (6) Sam admitted at trial that he habitually did not file income tax returns; this was his practice
before and during his marriage to Donna. (7) Sam estimated he owed about $33,504.00 in cumulative
back income taxes for the years 2003, 2004, 2005, and 2006. Throughout the marriage, Donna filed
her own tax returns, and presumably paid the taxes, on her income. She encouraged Sam to file his
tax returns, but he did not.

 A trial court exercises wide discretion in making an appropriate division of the community
assets and liabilities on divorce, and its division should not be disturbed on appeal unless an abuse
of discretion is shown. Murff, 615 S.W.2d at 698; Robles, 965 S.W.2d at 621. Although a tax
liability is not technically a "debt," a trial court may, in a divorce case, take the parties' tax liability
into consideration in its division of the marital estate, and may even require one party to assume the
other's tax liability. Mullins v. Mullins, 785 S.W.2d 5, 7-8 (Tex. App.--Fort Worth 1990, no writ);
Able v. Able, 725 S.W.2d 778, 780 (Tex. App.--Houston [14th Dist.] 1987, writ ref'd n.r.e.). In
making its "just and right" division of the marital estate, the trial court may consider many factors,
including the parties' relative earning capacity, the size of their separate estates, and the nature of the
community property being divided. Murff, 615 S.W.2d at 699. It is reversible error for a court to
refuse to consider tax liability, particularly when it is substantial and one of the spouses is without
means to pay the obligation. Baccus v. Baccus, 808 S.W.2d 694, 700 (Tex. App.--Beaumont 1991,
no pet.).

 Sam's only argument that the trial court abused its discretion in its ruling on the tax liability
is that Donna clearly benefitted from Sam's income, or that some income was necessarily transferred
from Sam to Donna, see IRC Title 26, § 66; therefore she has liability for that income as much as
he does. Nonetheless, it still is a function of the trial court's discretion. There was evidence Sam
has substantial earning capacity, in excess of $100,000.00 a year; Donna is an L.V.N., whose 2004
adjusted gross income was $32,240.00. Also, there was substantial evidence Sam made a conscious
decision not to pay his taxes, going back before the marriage. On this record, we refuse to find that
the trial court abused its discretion in its apportionment of tax liability.



(3) Failing to Find Donna in Contempt Was Not Error

 Sam unsuccessfully sought to have the trial court find Donna in contempt of court. Sam
claimed Donna had unplugged his freezer (causing food to spoil), disconnected the telephone service
at the couple's house, and taken video games without permission. We find no reason to find, or
require a finding of, contempt of court.

 Though Sam claimed Donna had the telephone at the couple's house disconnected, she said
she had done it with Sam's permission. She explained that she had had that telephone service since
1999 and wanted to keep it to maintain her credit rating. Sam claimed Donna had unplugged a
freezer, which he estimated was about a third full, causing a "couple, three, four hundred dollars"
worth of food to spoil. Donna denied unplugging the freezer. Donna also denied Sam's allegation
she had taken many video games.

 Sam offers no authority for his assertion the trial court erred by not holding Donna in
contempt. (8) The evidence conflicted on Sam's allegations. Because contempt power is necessary and
integral to judicial authority, judges have wide discretion in whether to find contempt. In re Bell,
894 S.W.2d 119, 127 (Tex. Spec. Ct. Rev. 1995) ("Although the exercise of this authority should be
tempered with common sense and sound discretion, nevertheless we accord the judge's contempt
power wide latitude because it is essential to judicial independence and authority.") (citations
omitted) (proceeding affirming State Commission on Judicial Conduct sanctions). 

 Based on the record before us, we find no abuse of discretion on the part of the trial court. 
 We overrule this point of error.

 We affirm the judgment of the trial court.



 Josh R. Morriss, III

 Chief Justice


Date Submitted: February 4, 2009

Date Decided: April 16, 2009


1. The trial court heard evidence and orally granted the divorce July 20, 2007, but did not sign
the final decree until March 14, 2008. A nunc pro tunc decree was signed April 3, 2008. 
2. The marriage occurred April 7, 2001, and the divorce was effective July 20, 2007.
3. We are not certain that abuse of discretion is the correct standard of review. See In re J.F.C.,
96 S.W.3d 256 (Tex. 2002); C.H., 89 S.W.3d 17; Boyd, 131 S.W.3d at 611; Tate v. Tate, 55 S.W.3d
1, 5 (Tex. App.--El Paso 2000, no pet.). But, for the purposes of this appeal, we will apply the
standard argued by both parties.
4. While not material to our analysis, precedent suggests that capital gain distributions from
separate property retain their separate nature, unless commingled. See Bakken, 503 S.W.2d at 317.
5. We can see, from Petitioner's Exhibit 4 that, on July 2, 2002, 688.348 shares were
transferred out of this account to another. There would be nothing to stop such transfers in or out
during the undocumented gaps in the account.
6. The trial court made a letter ruling that said each party was "responsible for the tax liability
on their respective income." The decree, though, says "all tax liability that was incurred during the
marriage years of 2001, 2002, 2003, 2004, 2005 and 2006, shall be paid by SAMUEL DWAIN
BORN and SAMUEL DWAIN BORN shall hold DONNA SUE BAILEY BORN and her property
harmless from any tax liability therefrom." We see no evidence of any tax liability beyond that
which would be owed on Sam's income, on which he did not pay. Therefore, what some may see
as a possibly over-broad decree by the trial court may prove to be accurate.
7. Sam said he "quit initially filing [income tax returns] in '97." He filed his 1997 taxes in
2000; his 1998 in 2001, and his 1999 and 2000 taxes in 2002. Donna testified Sam only filed past
due tax returns when the Internal Revenue Service contacted Sam and began to garnish the couple's
wages. 
8. We question whether we even have jurisdiction to address this point. An order finding a
party not in contempt is not a final, appealable judgment, so an appellate court lacks jurisdiction over
the matter. Norman v. Norman, 692 S.W.2d 655 (Tex. 1985); Wagner v. Warnasch, 156 Tex. 334,
295 S.W.2d 890 (1956). In this record, we find no order regarding contempt. While the matter was
addressed briefly during the trial, Sam did not pursue it to the point of obtaining a specific ruling.


span>
VI.      SUFFICIENCY OF THE EVIDENCE
            Wilson claims the evidence was legally and factually insufficient to support his conviction. 
            A.        Legal Sufficiency
            In our review of the legal sufficiency of the evidence, we employ the standards set forth in
Jackson v. Virginia, 443 U.S. 307, 319 (1979). This calls on the reviewing court to view the relevant
evidence in the light most favorable to the verdict and determine whether any rational trier of fact
could have found the essential elements of the crime beyond a reasonable doubt. Johnson v. State,
23 S.W.3d 1, 7 (Tex. Crim. App. 2000). In our review, we must evaluate all of the evidence in the
record, both direct and circumstantial, whether admissible or inadmissible. Dewberry v. State, 4
S.W.3d 735, 740 (Tex. Crim. App. 1999). 
            Wilson did not deny shooting Butch with a firearm and causing his death. At trial, Wilson
raised self-defense as a defensive theory. There was substantial evidence contrary to this position. 
About a month before the shooting, Wilson told a police officer who was responding to a trespass
by Butch on Wilson's property, that Wilson would kill Butch the next time he came on Wilson's
property and that the officer should bring a body bag. Investigator Jim Wright with the Hopkins
County Sheriff's Office testified that the scene indicated a shot was fired in a downward direction
from Wilson's house out a window and that the measurements did not "add up" with Wilson's
explanation he had had the rifle on his hip. Wright said the gun would have had to have been held
at a higher angle, held at the shoulder, to travel through the window and hit Butch where he was shot. 
Wilson told Wright at the scene both doors to the house were locked during the episode. Butch
presented no immediate threat to Wilson, according to Wright; Butch, approximately 236 pounds,
would have had to have climbed through a window to get to Wilson. The medical examiner testified
the shot went downward, front to back, and in a slightly left to right direction. Texas Ranger Philip
Kemp also said Wilson told him he had the gun with the stock held by his hip; Kemp said this
positioning of the rifle was not consistent with the scene—the condition of the window screen, the
broken window glass, and the window. Terri testified she had heard Wilson say he would kill Butch
more than twenty times; on ten occasions, Wilson told her that, if Butch was not in the picture, she
would not have to divorce or share her half of the community property; Wilson could put his horses
on her land; and he could get a job with her father's trucking business. Terri said that, on numerous
occasions, Butch would come to Wilson's door; Wilson "always" got his shotgun and told Terri if
Butch came in the house, he would shoot Butch; Terri said Wilson did not appear to be afraid of
Butch. On a prior occasion, Wilson went to Butch's chicken house, where Wilson brandished or
displayed a pistol and told Butch that, if Wilson could not have Terri, no one would. On another
occasion, when Terri was at Wilson's house, Butch knocked on the door and asked both Terri and
Wilson to come out and talk. Wilson got the shotgun and pointed it at the door, and Terri stood at
the door to prevent Wilson from shooting. Wilson got mad at Terri and told her that, if Butch would
have come through the door, "[Wilson] could have shot him, and it would have been over." 
            A rational trier of fact could have found all the essential elements of the crime of murder
beyond a reasonable doubt. We deny the legal sufficiency point of error.
            B.        Factual Sufficiency
            In a factual sufficiency review, the appellate court views all the evidence in a neutral light
and determines whether the evidence supporting the verdict is too weak to support the finding of
guilt beyond a reasonable doubt or if evidence contrary to the verdict is strong enough that the
beyond-a-reasonable-doubt standard could not have been met. Threadgill v. State, 146 S.W.3d 654,
664 (Tex. Crim. App. 2004) (citing Zuniga v. State, 144 S.W.3d 477, 486 (Tex. Crim. App. 2004)). 
            Wilson's argument is that "the only evidence before the jury was that Appellant was afraid
for himself and Mrs. Monday's lives, and that Mr. Monday caused the circumstances that resulted
in his death." However, there was evidence that Butch harassed Wilson, that Wilson had made
threats to and about Butch and that Wilson coveted Butch's property and wanted to work for Terri's
father. Wilson testified that he was afraid of Butch; that he felt Butch had seriously or was about
to seriously hurt Terri; and that, on one occasion, Wilson had spoken to Butch with a .40 Glock
pistol on Wilson's lap, which he denied pointing at Butch. Wilson maintained that, when Butch
approached Wilson's window, Butch slapped the window and said, "Boo," which scared Wilson, and
the shotgun accidentally went off. All of the evidence discussed above is sufficient for a rational jury
to find that Wilson intended to kill Butch; and the evidence was neither too weak to support the
finding of guilt beyond a reasonable doubt, nor was there evidence contrary to the verdict so strong
as to preclude the beyond-a-reasonable-doubt standard having been met. The evidence is factually
sufficient to support Wilson's conviction. We overrule this point. 
VII.     ADEQUACY OF COURT'S CHARGE ON APPARENT DANGER

            Wilson claims the trial court erred in failing to instruct the jury on the doctrine of apparent
danger. Wilson made written requests for jury charge instructions, one of which would have
contained language that a person "has a right to defend his life and person from apparent danger. . . ." 
The trial court refused this proposed language; the charge given the jury included an instruction on
self-defense and contained definitions of "reasonable belief," "deadly force," and an instruction on
when a person is justified in using deadly force. 
            In Valentine v. State, 587 S.W.2d 399, 401 (Tex. Crim. App. [Panel Op.] 1979), the Texas
Court of Criminal Appeals held that the concept of apparent danger was properly presented to the
jury where the charge instructed that the defendant's conduct would be justified if he reasonably
believed that the deceased was using or attempting to use unlawful deadly force against the
defendant at the time of the shooting. Id.


 The court also defined the term "reasonable belief."


 In
Valentine, the Texas Court of Criminal Appeals held that, by defining the term "reasonable belief"
as it did, the court instructed the jury that a reasonable apprehension of danger, whether it be actual
or apparent, is all that is required before one is entitled to exercise the right of self-defense against
his or her adversary. Id. 
            The jury was adequately charged in the applicable law and was able to consider the conduct
of both Wilson and Butch. This point is overruled. 
VIII.   EXTRANEOUS OFFENSES / BAD ACTS
            Wilson complains of the admission of testimony or evidence concerning the following bad
acts: that he committed telephone harassment; sold his prescription Vicodin to Terri; carried a
handgun in his truck; "flipped off" children; and fraudulently received worker's compensation
benefits, though able to work. 
            A.        Telephone Harassment
            After the first question concerning the subject of telephone harassment was asked, a hearing
was held outside the presence of the jury and the trial court sustained Wilson's objection to that line
of questioning, and instructed the jury to disregard the previous question on the subject. The jury
is presumed to have followed the trial court's instructions. Livingston, 739 S.W.2d 311; Carter, 614
S.W.2d 821. Wilson did not request a mistrial. He has thus failed to preserve error as to this matter. 
             B.        Drug Sales
            During the State's direct examination of Terri, the State asked why, at the time of Butch's
death, she had been considering leaving him for Wilson. Terri answered, "Jimmy was selling me
Vicodin for about three years." Wilson lodged no objection, and the State did not pursue the subject;
rather, the State turned its line of questioning to the nature of the relationship between Terri and
Wilson. During Wilson's case-in-chief, he presented a medical doctor who testified about Wilson's
colon surgery and resultant physical fragility regarding any direct blow to his abdomen, which could
lead to such consequential injuries as a ruptured small intestine, bleeding, or injury to his spleen. 
On cross-examination, the State questioned this physician about a patient who was prescribed
Vicodin as pain medication and then sold that medication to another person. The trial court
sustained Wilson's objections to this line of testimony. In the State's rebuttal case, Terri again
testified, at length, about her dependence on Vicodin, which she contended was encouraged and
fostered by Wilson continuing to give or sell her the pain medication. 
            In his brief, Wilson asserts the State failed to respond to Wilson's timely request for
notification of bad acts or crimes the State would attempt to adduce in its case-in-chief. From our
review of the record, the State does not appear to have supplied any formal notice of such evidence. 
However, Wilson made no objection to Terri's mention of Vicodin sales, and the State did not pursue
that topic in its case-in-chief. The State did not specifically ask Terri about drug sales from Wilson
and did not seek to expand this issue, injected by Terri, in front of the jury until cross-examination
of Wilson's witness, during the defense's case-in-chief and the State's rebuttal case. A defendant is
only entitled to pretrial notice of extraneous offenses or bad acts which the State would offer in its
case-in-chief, not any the State may adduce in cross-examination of defense witnesses, or in the
State's rebuttal case. Jaubert v. State, 74 S.W.3d 1, 4 (Tex. Crim. App. 2002).
            The trial court sustained Wilson's objections to the State's implications, cross-examining
Wilson's medical doctor, that Wilson sold his pain medication. However, in the State's case in
rebuttal, the trial court, over Wilson's running objection, allowed the State to question Terri
extensively about Wilson giving, then selling, her his prescription pain medication, Vicodin.


 Terri
testified she grew chemically dependent on the pills, sometimes taking as many as five a day. She
testified that sometimes Wilson would fill a prescription and she would immediately buy all of the
pills from him. She testified that, on other occasions, Wilson would only sell her three or four pills
at a time, in order to make her come see him more often. When she told him she wanted to go to a
rehabilitation facility to end her dependence, Wilson began giving, rather than selling, her the pills. 
            Wilson complains on appeal, as he did before the trial court, that this testimony constitutes
evidence of bad acts whose prejudicial value substantially outweighs any probative value the
evidence might have. See Tex. R. Evid. 403, 404(b). Trial courts are required to exclude evidence
when its probative value is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid.
403; Montgomery v. State, 810 S.W.2d 372, 392 (Tex. Crim. App. 1990) (op. on reh'g). In making
this determination, the trial court should "consider the inherent tendency that some evidence may
have to encourage resolution of material issues on an inappropriate basis and should balance
carefully against it the host of factors affecting probativeness, including relative weight of the
evidence and the degree to which its proponent might be disadvantaged without it." Fuller v. State,
829 S.W.2d 191, 206 (Tex. Crim. App. 1992). 
          A trial court's decision in balancing these factors is reviewed under the abuse of discretion
standard and is disturbed on appeal only when the trial court's decision falls outside the zone of
reasonable disagreement. Montgomery, 810 S.W.2d at 391–92.
            Here, there was significant danger of Wilson being prejudiced by testimony he sold drugs to
Terri and used these drugs to manipulate and control her. The evidence has great potential to
impress the jury in some irrational but nevertheless indelible way. See Wyatt v. State, 23 S.W.3d 18,
26 (Tex. Crim. App. 2000). The State's proffered reasons to the trial court for the admission of this
line of testimony were a) that Wilson's injuries to his back were not as severe as he had asserted in
his testimony and b) that Terri was unable to resist Wilson and therefore cease her relationship with
him, where he prompted her to become dependent on a prescription medication, then continued to
supply her with that medication. 
            We find that any probative value in this line of testimony, allegedly to impeach a defensive
theory, is substantially outweighed by the likely prejudicial effect. The extent of any back pain
suffered by Wilson was not a fact of consequence and did not bear directly on the issue of whether
he shot Butch intentionally, in self-defense, or accidentally. Likewise, the extent of any
manipulation or control exerted by Wilson over Terri was not directly relevant to the ultimate issues
of the trial, and the prejudicial value of this testimony substantially outweighs any probative value. 
Further, this evidence was not necessary for the State to prove or disprove a fact of consequence. 
We find it was error to allow the State to pursue this line of testimony. 
            We now turn to a harm analysis. In our review of nonconstitutional error, we are to disregard
errors, defects, irregularities or variances that do not affect substantial rights of the accused. Tex.
R. App. P. 44.2(b). A "substantial right" is affected when the error had a substantial and injurious
effect or influence in determining the jury's verdict. Tex. R. App. P. 44.2(b); King v. State, 953
S.W.2d 266 (Tex. Crim. App. 1997). If, on the record as a whole, it appears the error "did not
influence the jury, or had but a slight effect," we must conclude that the error was not harmful and
allow the conviction to stand. Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).
          In order to properly conduct a harm analysis under Rule 44.2(b), we review the error as a type
of "Other Errors," and we must disregard the error unless it "affect[ed] [appellant's] substantial
rights." Tex. R. App. P. 44.2(b). For claims of nonconstitutional error, the Texas Court of Criminal
Appeals has held that "a conviction should not be overturned unless, after examining the record as
a whole, a court concludes that an error may have had 'substantial influence' on the outcome of the
proceeding." Burnett v. State, 88 S.W.3d 633, 637 (Tex. Crim. App. 2002). In other words, if we
have "a grave doubt" that the result was free from the substantial influence of the error, then we must
reverse. Id. The court has explained that "grave doubt" means that "in the judge's mind, the matter
is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." 
Id. at 637–38 (citing O'Neal v. McAninch, 513 U.S. 432, 433–36 (1995)). Thus, "in cases of grave
doubt as to harmlessness the petitioner must win." Burnett, 88 S.W.3d at 638.
            In considering harm, we must review the entire record to determine whether the error had
more than a slight influence on the verdict. See King, 953 S.W.2d at 271 (citing Kotteakos v. United
States, 328 U.S. 750, 776, (1946)); Reeves v. State, 969 S.W.2d 471, 491 (Tex. App.—Waco 1998,
pet. ref'd). If the court finds that the error did have more than a slight influence on the verdict, it
must be concluded that the error affected the defendant's substantial rights in such a way as to require
a new trial. Reeves, 969 S.W.2d at 491. If the court has grave doubts about the error's effect on the
outcome, the case must be remanded for a new trial. Id. Otherwise, the court should disregard the
error. Lopez v. State, 990 S.W.2d 770, 778 (Tex. App.—Austin 1999, no pet.); Reeves, 969 S.W.2d
at 491.
            We have previously summarized the evidence in this case. Wilson never denied shooting
Butch; the only issue was whether Wilson shot him in self-defense, defense of a third person, or if
the shooting was accidental. The jury was presented with testimony about the scene of the crime and
the analysis of whether the scene coincided with Wilson's statements that the shotgun discharged
accidentally. Wilson testified, and the jury was able to judge his credibility and demeanor. 
Considering the entire record before us, we cannot say we have grave doubts about the harmfulness
of this error on Wilson's substantial rights. The ultimate issue of this case was whether the jury
believed Wilson's defenses of accident, self-defense, and defense of a third person. We find the error
in admitting evidence of Wilson selling and giving prescription pain medication to Terri did not have
a substantial influence on the outcome of the trial, and accordingly overrule this point of error. 
            C.        Treatment of Terri's Children
            Terri testified Wilson would "cuss" and "flip . . . off" her children. A discussion at the bench
followed; Wilson's attorney said that, "if we're going to get into prior bad acts - - . . . then we've got
to object to that, Your Honor." The State's theory (at trial and on appeal) was that interaction
between Wilson and the victim's family was inseparable from conduct between Wilson and the
victim, and thus admissible under Tex. Code Crim. Proc. Ann. art. 38.36 (Vernon 2005).


 The trial
court sustained Wilson's objection and instructed the attorneys, "No, we shouldn't get into that at this
point, whatsoever. Okay." The general rule for presenting a complaint for appellate review is a
showing in the record (1) that the complaint was made to the trial court by a request, objection, or
motion that was timely and sufficiently specific to make the trial court aware of the grounds of the
complaint and (2) that the trial court ruled adversely (or refused to rule, despite objection). Tucker
v. State, 990 S.W.2d 261, 262 (Tex. Crim. App. 1999). To reach the level of an adverse ruling, if
the objection is sustained, counsel must then ask for an instruction to disregard. If the instruction
is given, counsel must then move for a mistrial. Nethery v. State, 692 S.W.2d 686, 701 (Tex. Crim.
App. 1985). It appears from the record the trial court sustained Wilson's objection, and Wilson did
not ask for an instruction to disregard or for a mistrial. Wilson has not preserved this complaint. 
            D.        Carrying a Handgun
            Regarding Wilson's complaint that the trial court admitted evidence Wilson carried a
handgun, we assume he refers to Terri's testimony, related to her by Wilson, that on one occasion
Wilson went to Butch's chicken houses, brandished a pistol, and told Butch that, if Wilson could not
have Terri, no one would. Wilson posed no objection to this testimony. Further, such conduct
would clearly fall in the purview of Tex. Code Crim. Proc. Ann. art. 38.36. No error is shown. 
            E.        Worker's Compensation Benefits
            Wilson complains about the State eliciting testimony suggesting Wilson received workers
compensation benefits from an injury in an oil field, yet continued to work as a truck driver or
breaking horses. Wilson made no objections to this line of testimony. No error was preserved.
            Having found no merit in Wilson's points of error, we affirm the trial court's judgment. 
 

                                                                        Jack Carter
                                                                        Justice
 
Date Submitted:          October 19, 2005
Date Decided:             November 3, 2005

Publish